1

2  **CABALLERO & GETTLEMAN LAW OFFICE, INC.**

3  Elizabeth M. Caballero (SBN 240249)
   Jonathan Che Gettleman (SBN 243560)

4  223 River Street, Suite D
   Santa Cruz, CA 95060

5  Telephone: (831) 427-9055
   Facsimile: (831) 515-5228

6  cglaw2015@gmail.com

7  Attorneys for Plaintiffs,
   Felicia Smith and

8  Michael Warren-Smith

9
                    UNITED STATES DISTRICT COURT
10
          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION
11

| | |
|---|---|
| 12  TAMARIO SMITH, DECEASED, through his Co-Successors-in-Interest FELICIA SMITH, individually and MICHAEL WARREN-SMITH, individually, | Case No. 5:21-cv-00421 |
| | **FIFTH AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS WITH PENDANT STATE LAW CLAIMS.** |
| 13 | |
| 14          Plaintiffs, | |
| 15  vs. | **1)  Deliberate Indifference to Serious Medical Need (42 U.S.C. §1983)** |
| 16  COUNTY OF SANTA CRUZ, a municipal corporation; JAMES HART, in his individual capacity as Sheriff for the COUNTY OF SANTA CRUZ; CALIFORNIA FORENSIC MEDICAL GROUP; WELLPATH, LLC; GERALD LAZAR, M.D.; DOES 4-50, | **2)  Right of Association (42 U.S.C. §1983)** |
| 17 | **3)  Violation of 42 U.S.C. §1983** |
| 18 | **4)  *Monell* (42 U.S.C. §1983)** |
| 19 | **5)  Wrongful Death (CCP §377.60)** |
| 20          Defendants. | **6)  Negligence** |
| 21 | **7)  ADA- 42 U.S.C. §12132** |
| 22 | **8)  29 U.S.C. §794(a)** |
| 23 | |
| 24 | **JURY TRIAL DEMANDED** |
| 25 | |
| 26 | |

27

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

1

1    COMES NOW, Plaintiffs TAMARIO SMITH, Decedent, by and through his co-successors

2    in interest, FELICIA SMITH and MICHAEL WARREN-SMITH, by and through their attorneys,

3    CABALLERO & GETTLEMAN LAW OFFICE, INC, for their Complaint against Defendants, and

4    state as follows:

5                                    **INTRODUCTION**

6    At the time of his death, TAMARIO SMITH (Hereinafter TAMARIO) was 21 years old.  He

7    had been incarcerated at the Santa Cruz County Jail from January 30, 2020, until his untimely death

8    on Mother's Day, May 10, 2020.  TAMARIO's on again/off again boyfriend alleged that on November

9    30, 2019, they had gotten into an argument that ended with TAMARIO punching him on the bicep,

10   resulting in a small bruise.  TAMARIO had two prior misdemeanor domestic violence convictions

11   with the same partner that had resulted in protective orders.  In response to this allegation, on

12   December 10, 2019, the Santa Cruz District Attorney's office charged TAMARIO with violating Penal

13   Code §273.5, as a felony, two counts of violating Penal Code §166(c)(1), violation of a protective

14   order and one count of violating Penal Code §143(e)(1), domestic battery. (Exhibit A, p. 1-3, Criminal

15   Case 19CR07460.)

16   Although the court originally granted TAMARIO supervised release, it remanded TAMARIO

17   to custody on January 30, 2020, due to his failure to appear on two occasions.  Due to TAMARIO's

18   overwhelming and obvious mental health issues, his public defender declared a doubt as to his

19   competency to stand trial on February 14, 2020.  The Superior Court ordered two psychological

20   evaluations for TAMARIO to determine his competency.  The psychological evaluations detailed that

21   TAMARIO had a history of schizophrenia and was suffering from "severe" psychosis at the time of

22   the evaluation.  In light of these reports, the Superior Court found TAMARIO incompetent to stand

23   trial on March 26, 2020.  Due to COVID restrictions at that time, TAMARIO could not be transferred

24   to the State Hospital.  Those restrictions, however, were lifted on May 20, 2020, and the State Hospital

25   was allowed to receive new patients.

26   All Defendants' created an environment of collective inaction where numerous systemic

27   failures occurred while TAMARIO was in custody; based on Defendatns' well-established customs,

Smith, et al v. County, et al.                                    Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

2

practices and policies, all resulting in Defendants' failure to observe, treat, protect and provide medical treatment for TAMARIO which constituted a substantial factor and moving force in his untimely death.  During his first six weeks in custody, TAMARIO entered the jail and remained in a pattern of spiraling psychosis due to a failure by all Defendants to treat and medicate him.  Finally, in March 2020, jail psychiatrist, Defendant LAZAR, prescribed TAMARIO a battery of antipsychotic medications.  LAZAR knew these medications could cause hyponatremia.  Yet, LAZAR prescribed them without reviewing TAMARIO's prior lab results that detailed that he had recently suffered from hyponatremia and without obtaining any of TAMARIO's vital signs, blood labs or patient consent. On March 11, 2020, Dr. LAZAR prescribed even more anti-psych meds, and ordered follow up within "one week."  Despite his order to follow up with TAMARIO in "one week,"  Defendant LAZAR never saw TAMARIO again, essentially abandoning his patient.  This was true even though on April 29, 2020, Dr. Lazar expressly reviewed his March 11 order and still did not follow up with TAMARIO. No one from COUNTY behavioral health saw TAMARIO from February 26, 2020, even in segregation rounds, despite TAMARIO's express written request to be seen due to his medication "not working" just days before his death.

During his last weeks in custody, COUNTY Defendants inexplicably removed TAMARIO from a mental health unit and placed him in a segregated, hard core, gang drop out unit where TAMARIO was neither a current or former gang member and where his charges, in custody behavior and severe mental illness did not warrant such severe confinement.  For twenty to twenty-three hours a day, TAMARIO was housed in total isolation with nothing but a nonfunctioning intercom button. TAMARIO had no way of summoning help outside of hourly safety checks.   Other than perfunctory hourly "safety checks," COUNTY Defendants did not provide the proper observation, protection and care for TAMARIO as required by their own policies for inmates in segregation.  Further, custody staff, as a custom, ignored their special management, classification, custodial, and other materials policies in a manner that directly contributed to TAMARIO's death.  TAMARIO's cell mates gave horror stories of the level of TAMARIO's decompensation in isolation.

Smith, et al v. County, et al.                                          Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

3

WELLPATH LLC/CFMG medical personnel saw TAMARIO on two occasions within just two weeks of his death.  Due to WELLPATH LLC/CFMG's dilatory and indifferent care, they failed to assess TAMARIO properly and send him to the doctor on at least 5 occasions.  Tamario Smith suffered from repeatedly high pulse rates and did not once see a doctor for it, despite the Wellpath policy requiring it.  None of WELLPATH LLC/CFMG's own personnel files possessed the required documentation for them to treat anyone in the Satna Cruz County jail, including its Health Services Administrator.  In April 2020, TAMARIO began suffering symptoms of overhydration, to wit headaches and neurological failure.  WELLPATH LLC/CFMG personnel, acting outside the scope of their nursing protocols, instructed and encouraged TAMARIO to drink more water without limit even though he was suffering symptoms from over-hydration.  WELLPATH LLC/CFMG's own postmortem report indicated that TAMARIO should have and did not see a doctor on April 28, 2020, less than two weeks after he died.

Despite written policies directly to the contrary, the county jail had a long-standing practice, predating COVID, wherein jail staff would leave a mop bucket filled with cleaning solution in each housing unit's day room for inmate use.  Sadly, in the days preceding TAMARIO's death, both unit video, inmate/witness statements and plaintiffs' testing of TAMARIO's gastric contents confirm that TAMARIO was drinking the dirty water cleaning solution from the mop bucket left in the unit day room.

On May 10, 2020, corrections officers discovered TAMARIO, who was lying directly underneath the cell's intercom button, faced down, covered in his own emesis.  Neither correction officer provided TAMARIO with any first aid/CPR despite observing that TAMARIO was "gurgling" and had a "weak" pulse.  Instead, corrections officers waited crucial minutes for medical personnel to arrive to start administering TAMARIO any life-saving measures.  TAMARIO was declared dead within 20 minutes of corrections officers finding him unresponsive in his cell.

Dr. Fiore, the Santa Cruz County Coroner' pathologist, determined that TAMARIO died of sudden cardiac arrest due to electrolyte imbalance associated with excessive consumption of water and coffee, in other words, hyponatremia.  However, of note, the Sheriff-Coroner never tested the

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

4

contents of TAMARIO's stomach nor did they test the pink fluid they found in the toilet and the drinking cups in his cell.  The Sheriff-Coroner failed to note the significance of TAMARIO's particularly heavy fluid-saturated lungs, namely, that TAMARIO had asphyxiated from his own vomit. Nor did Dr, Fiore test for SIADH, which is a deadly side effect of anti-psychotic medication where the patient's sodium levels drop form a hormone, essentially causing, hyponatremia.

On May 14, 2020, the court dismissed the criminal case against TAMARIO due to him being deceased.  (Exhibit A, p. 15.). On May 20, 2020, the California State Hospital System began accepting patients again.

## JURISDICTION

1. This is a civil rights wrongful death/survival action arising under 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of California.  This action arises under Title 42 of the United States Code, sections 1983 and 1988.  Jurisdiction is conferred upon this Court by 28 U.S.C §§ 1331 and 1343 and 42 U.S.C. Section 12188(a).  Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. §1367, to hear and decide claims arising under state law.  The amount in controversy herein, excluding interest and costs, exceeds the minimum jurisdictional limit of this Court.

2. A substantial part of the events and/or omissions complained of herein occurred in the County of Santa Cruz, California, and this action is properly assigned to San Jose Division of the United States District Court for the Northern District of California pursuant to 28 U.S.C. section 1391(b).  This Court has jurisdiction to grant the declaratory relief requested pursuant to 28 U.S.C. §2201 and Federal Rules of Civil Procedure, Rule 57.

3. A proper and timely tort claim was presented to the COUNTY OF SANTA CRUZ on behalf of Plaintiffs and Decedent, pursuant to Government Code §910 et seq., on May 27, 2020, and amended on September 21, 2020, which was denied by letter and Notice of Rejection on July 30, 2020. This action was thereafter filed within all applicable statutes of limitation.

Smith, et al v. County, et al.                                                                                 Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

5

4.     Plaintiffs provided notice of intent to sue under California's Code of Civil procedure section 364 subdivision (a), part of MICRA to the following medical professionals on the following corresponding dates: WELLPATH, LLC/California Forensic Medical Group, on June 30, 2020.

**PARTIES**

5.     Plaintiff FELICIA SMITH is and was at all times herein mentioned the mother of Decedent TAMARIO SMITH and a resident of the State of California.  Plaintiff FELICIA SMITH, brings these claims individually for the wrongful death and violation of her personal rights, and as co-successor in interest to Decedent TAMARIO SMITH pursuant to California Code of Civil Procedure §§377.10 et seq.  She brings these claims under California State and federal law.

6.     Plaintiff MICHAEL WARREN-SMITH is and was at all times herein mentioned the father of Decedent TAMARIO SMITH and at all times relevant to this lawsuit was a resident of the State of California.  Plaintiff, MICHAEL WARREN-SMITH brings these claims individually for the wrongful death and violation of his personal rights, and as co-successor-in-interest to Decedent TAMARIO SMITH pursuant to California Code of Civil Procedure §§377.10 et seq.  He brings these claims under California state and federal law.

7.     Plaintiffs FELICIA SMITH and MICHAEL WARREN-SMITH bring these claims pursuant to California Code of Civil Procedure §§377.20 et seq., which provides for survival actions. All Plaintiffs also bring claims pursuant to California Code of Civil Procedure §§377.60, et seq., for wrongful death.  All Plaintiffs also bring claims for violations of their personal federal constitutional rights to familial association.  All Plaintiffs bring their claims individually, and Plaintiffs FELICIA SMITH and MICHAEL WARREN-SMITH also bring claims on behalf of Decedent TAMARIO SMITH, on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, federal and state civil rights law, and California law.  Plaintiffs also bring these claims as Private Attorneys General, to vindicate not only their rights, but others' civil rights of great importance.  (See Exhibit M, Declarations of Michael Warren Smith and Felicia Smith.)

8.     Defendant COUNTY OF SANTA CRUZ ("COUNTY") is a municipal corporation, duly organized and existing under the laws of the State of California and is the employer of the

Smith, et al v. County, et al.                                                                              Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

6

individual COUNTY defendants, as well as certain DOE DEFENDANTS. Defendant COUNTY operates and is responsible for the actions, omissions, policies, procedures, practices and customs of its various agents and agencies, including the Santa Cruz County Sheriff's Department ("Sheriff's Office") and the Santa Cruz County Jail ("Jail"), and their agents and employees.  Defendant COUNTY is responsible for County Mental/Behavioral Health, an agency that provides mental health treatment to Santa Cruz County Jail inmates, and was acting within the course and scope of that employment at such times.  At all material times, Santa Cruz County was a policy making official for the COUNTY OF SANTA CRUZ Health Services Agency, including County Mental Health and Jail Behavioral Health at the Santa Cruz County Jail.

9.     Defendant, Sheriff JAMES HART ("HART"), and at all times mentioned herein was employed by Defendant COUNTY as Sheriff for the COUNTY and was acting within the course and scope of that employment at such times.   He is being sued in his individual capacity as Sheriff for the COUNTY OF SANTA CRUZ.  At all material times, Defendant HART was ultimately responsible for the investigating, hiring, screening, training, retention, supervision, discipline, counseling, and control of all Santa Cruz County Sheriff's Department custodial employees and/or agents, medical staff and Doe Defendants.

10.     At all relevant times to this complaint, Defendant HART was the final policy making official for the COUNTY OF SANTA CRUZ Sheriff's Office and Santa Cruz County Jail, and he was responsible for the promulgation of the policies and procedures and alliance of the practices/customs pursuant to which the acts of the Sheriff's Department alleged herein were committed, as well as the supervision and control of officers who are or were employed by the Sheriff's, who are under his command and/or who report to him, including the Defendants to be named.  At all relevant times, HART, knew of and acquiesced to the unconstitutional practices, policies and customs that caused TAMARIO's death.

11.     Defendant Gerald LAZAR, M.D., is a psychiatrist who was contracted by Santa Cruz County, and its affiliates, Santa Cruz County Health Services and Santa Cruz County Behavioral Health, to provide psychiatric services to inmates at the Santa Cruz County jail, located within Santa

Smith, et al v. County, et al.                                           Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

7

Cruz County, California.  Gerald LAZAR, M.D., treated and prescribed medication to TAMARIO during his most recent incarceration at the Santa Cruz County Jail.   Therefore, Gerald LAZAR, M.D., is a state actor for purposes of 42 U.S.C. §1983.  Plaintiffs identify Gerald LAZAR, M.D. as Doe Defendant 3.

12.     The California Health and Human Services Agency's Department of Mental Health oversees California's public mental health system.   The Bronzan-McCorquodale Ace, Cal. Welf. & Inst. Code §5600-5772, enacted in 1991, shifted much of the responsibility for treating and protecting the mentally ill from the State to its 58 counties, a program known as "realignment."   California provides its counties with substantial funds earmarked for the evaluation and treatment of the mentally ill through various realignment programs.

13.     On November 2, 2004, California enacted Proposition 63, now known as the Mental Health Services Act or MHSA, to fund local mental health programs through a special tax on high incomes.  Much of this revenue goes to counties to expand mental health programs.

14.     Cal. Welf. & Inst. Code §§ 5650-5667 require county mental health departments to give the California Department of Mental Health assurances that they are providing mental health services required by state statute.  There are multiple state regulations that pertain to facilities and mental health operations.  Defendant County of Santa Cruz Health Services Agency Behavioral Health Division is assigned responsibility for carrying out state mandated and funded services for the mentally ill in Santa Cruz County.

15.     THE COUNTY is a public entity and is sued under Title 42 U.S.C. §§ 1983 and 1988 for violations of the Fourth and Fourteenth Amendments of the United States Constitution, California state law, the California Tort Claims Act, and the Government Code for the acts and omissions of COUNTY OF SANTA CRUZ (including Sheriff's Office and the jail), and DOES 4-30, (Collectively referred to herein as "DEFENDANTS") and each of them, who at the time they caused Plaintiffs' injuries and damages were duly appointed, qualified and acting officers, employees, and/or agents of COUNTY acting within the course and scope of their employment and/or agency.  In engaging in the conduct described herein, DEFENDANTS, inclusive, exceeded the authority vested in them as public

employees under the United States and California Constitutions and as Sheriff Deputies employed by Defendant COUNTY.

16.     Plaintiffs are informed and believe and thereon allege that each DOE Defendants 4-30 so named, at all material times, were employed by Defendant COUNTY (including Sheriff's Office, the Santa Cruz County Jail and medical personnel and agents of Defendant County of Santa Cruz, including but not limited the Health Services Agency for the County of Santa Cruz) at the time of the conduct alleged herein.  Plaintiff alleges that the conduct of each defendant deprived TAMARIO of his constitutional rights to life, his constitutional right to adequate safety, as well as custodial care and supervision, and caused TAMARIO to suffer grievous harm and physical injuries prior to his death, and ultimately caused his death while he was in the custody of Defendants.

17.     DOE Defendants 4-30 were responsible for TAMARIO's care while in custody of the Santa Cruz County Jail.  In doing the acts or omissions hereinafter described, certain DOE Defendants 4-30 acted within the course and scope of their employment with Defendant COUNTY of SANTA CRUZ and acted under color of state law.  The DOE Defendants were either Correctional Officers, jail staff, Sheriff's Deputies, Sergeants, Captains, Lieutenants, or other Peace Officers, and/or civilian employees and/or agents who were responsible for the care, housing, observation, medical needs and safety of inmates, including TAMARIO.

18.     Plaintiffs are ignorant of the complete true names and capacities of Defendant DOES 4 through 30, inclusive, and, therefore, sue these defendants by such fictitious names.  Plaintiffs will amend this Complaint to show said Defendants' true names and capacities when the same have been ascertained.  Plaintiffs are informed, believe, and thereon allege that all Defendants sued herein as DOES 4-30 were are in some manner responsible for the acts, omissions, and injuries alleged herein.

19.     The Santa Cruz Main Jail is owned and operated by County of Santa Cruz and staffed by County of Santa Cruz Sheriff's deputies and other non-deputized citizen correctional staff.

20.     Plaintiffs allege, on information and belief, that each of the Defendants sued herein was wrongfully, deliberately indifferent, unreasonably, negligently, and/or otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and

Smith, et al v. County, et al.                                    Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

9

damages to Plaintiff and/or Decedent. Further, one or more DOE Defendants 21-30 was at all material times responsible for the hiring, training, supervision, and discipline of other defendants, including both the individually named and DOE Defendants.

21.     Plaintiffs allege, on information and belief, that each of the Defendants was at all material times an agent, servant, employee, partner, joint venture, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of that relationship. Each of the Defendants caused and is responsible for the unlawful conduct and resulting harm by, inter alia, personally participating in the conduct, or acting jointly and in concert with others who did so, by authorizing, acquiescing, condoning, acting, omitting or failing to take action to prevent the unlawful conduct, by promulgating or failing to promulgate policies and procedures pursuant to which the unlawful conduct occurred, by failing and refusing to initiate and maintain proper and adequate policies, procedures and protocols, and by ratifying and condoning the unlawful conduct performed by agents and officers, deputies, medical providers and employees under their direction and control. Plaintiffs further allege, on information and belief, that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may hereinafter be otherwise, specifically alleged. At all material times, each Defendant was an integral participant, jointly and fundamentally engaged in constitutionally violative, unlawful, and/or tortious activity, resulting in the deprivation of Plaintiffs' and Decedent's' constitutional rights and other actionable harm.

22.     The acts and omissions of all individual Defendants were at all times pursuant to the actual customs, policies, practices, and/or procedures of the COUNTY OF SANTA CRUZ.

23.     At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California.

24.     At all times relevant to this complaint, Defendant WELLPATH, LLC ("WELLPATH") is Delaware corporation with its principal place of business located in Nashville, TN as well as San Diego, CA. Defendant WELLPATH LLC is a vendor of the County and provides,

Smith, et al v. County, et al.                                                          Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

10

under written contract, medical services to inmates incarcerated in Santa Cruz County detention facilities.  Defendant WELLPATH LLC, in a memorandum of understanding, agreed to work together with Defendant County's Health Services Agency, Mental Health, and Defendant County Sheriff's Department to cooperatively determine and provide appropriate levels of care and treatment for all mentally disordered persons who are incarcerated at the County Jail; to include sharing, cross-referencing, and annual review of policy and procedures.

25.     At all relevant times to this complaint, California Forensic Medical Group ("CFMG") is a California Corporation with its principal place of business in San Diego, CA.  Defendant CFMG was purchased by Defendant WELLPATH LLC in 2018.  Defendant CFMG is a vendor of the County and provides, under written contract, medical services to inmates incarcerated in Santa Cruz County detention facilities.  Defendant CFMG, in a memorandum of understanding, agreed to work together with Defendant County's Health Services Agency, Mental Health, and Defendant County Sheriff's Department to cooperatively determine and provide appropriate levels of care and treatment for all mentally disordered persons who are incarcerated at the County Jail; to include sharing, cross-referencing, and annual review of policy and procedures. DOE Defendants 31-40 are WELLPATH, LLC/CFMG employees whose names are currently unknown.  Plaintiffs will amend the complaint to name DOES 31-40 when their identities become known.

26.     Defendants CFMG and WELLPATH, LLC have stipulated that for this civil action, CFMG and WELLPATH, LLC are the same entities, including, but not limited to, for purposes of liability and damages.

**County Contracts Medical Services with CFMG/Wellpath LLC**

27.     As a cost-cutting measure, on or about September 17, 2012, the County, through its policymakers including the County Board of Supervisors, upon recommendation by then Sheriff-Coroner Phillip Wowak, contracted with CFMG (now WELLPATH, LLC) to replace the Santa Cruz County Health Services Agency as the provider of inmate medical services at the Jail.   The approximately $3,000,000 yearly contract was projected to save the County approximately $1,500,000 per year in inmate medical services.

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

11

28.     The County hired WELLPATH LLC/CFMG to provide these services with objective and subjective deliberate indifference to CFMG's extensive history of allegations and lawsuits over inadequate medical care.  If not already known to the County, SCSO and its policy makers, with minimal due diligence would have exposed this history.  After CFMG took over medical services at the Jail, inmates died at a shocking and unprecedented rate and generated public outcry, including reports from the Santa Cruz County Grand Jury.  CFMG's population-adjusted rate for suicide/drug overdose deaths is approximately 50 percent higher than in other county jails.  At least three other County's Grand Juries have also criticized the company's role in inmate deaths.  A company spokesperson has admitted that the company has settled six lawsuits in five years.  Several more are pending including in Monterey where the plaintiffs obtained a far-reaching preliminary injunction enjoining CFMG's unconstitutional practices.  See *Hernandez v. County of Monterey*, N.D. Cal. Case No. 5:13-cv-02354, Order, April 15, 2015.

29.     Defendant COUNTY contracted with CFMG/WELLPATH, LLC to provide medical services to inmates at the County Jail but not mental health services.  At the time of TAMARIO's death, Defendant COUNTY provided mental health services to inmates at the County Jail.  Contrary to industry standards, the county jail had a bifurcated medical record system.  CFMG/WELLPATH, LLC had a separate medical record keeping system for inmate/patients from the record keeping system that was maintained by Defendant COUNTY for inmate/patients with mental health issues/diagnosis.  Other than the inmate/patient's medication chart, CFMG/WELLPATH, LLC medical personnel did not have access to Defendant COUNTY's mental health records for the same inmate/patients; and vice versa, Defendant COUNTY's jail behavioral health personnel, to include Defendant LAZAR, did not have access to CFMG/WELLPATH LLC's medical record system.

30.     Defendant COUNTY had a policy, practice and custom of not training any jail correctional officers regarding inmates with mental health issues/diagnosis.  Consequently, correctional officers did not know how to interact, observe or protect vulnerable inmates with mental health issues/disorders in general, and TAMARIO in particular.  Defendant COUNTY had a policy, practice and custom of providing an inmate alert in the Jail Management System (JMS) for those

inmates who were found incompetent to stand trial (IST), but did not train correctional staff on what this alert signified or that additional monitoring was necessary.  Correction officers did not treat inmates with an IST alert any differently than any other inmate, all to the detriment of inmates in general and TAMARIO in particular.  Consequently, on the day of TAMARIO's death, the two corrections officers in charge of conducting safety checks in TAMARIO's unit observed that TAMARIO was "off" and "acting strange" but, since they had no mental health training, they did nothing to report this concerning behavior to jail behavioral health or medical personnel to assess TAMARIO.

31.     Defendants COUNTY and WELLPATH, LLC/CFMG had a long-established policy, practice and custom of not following policies regarding special management inmates and inmates confined to segregated units.  The written policy, SCSO Policy 504, details the extensive requirements for jail corrections, mental health and medical staff to conduct coordinated supervision, monitoring and observation for inmates held in special management units such as the unit where TAMARIO lived for the last five weeks of his life.  Despite the written policy, Defendants COUNTY and WELLPATH, LLC/CFMG's practice was to not follow the written policy and they did not adhere to SCSO Policy 504 requirements of keeping written logs that demonstrated such coordinated monitoring was in fact occurring.

32.     Defendants COUNTY and HART had a well-established policy, custom and practice of not conducting any self-facing or internal investigations during their legally mandated in-custody death reviews (ICDR).  For years, involving at least 6 in-custody deaths prior to and including TAMARIO's death, Defendants COUNTY and HART, who personally attended these meetings, did not generate one document or one policy change during or because of their ICDRs.

33.     Defendants COUNTY and HART had a well-established policy, custom and practice of not adequately training correction staff to monitor inmates.  Several deaths in the Santa Cruz County jail, as detailed in paragraphs 60-72 demonstrate that corrections personnel had a long-standing practice of not adequately monitoring inmates which directly resulted in serious injury and death.  The failure to monitor inmates was entrenched to such a degree that when inmate German Carrillo was

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

13

brutally murdered by his cellmates just months before TAMARIO's death, corrections officers did not discover his corpse until 36 hours after he had been killed.  Corrections officers conducted 36 safety checks, served him three meals and performed a clothing exchange in the unit, all while German Carrillo lay dead in his cell bed.  Despite this colossal failure to monitor and protect Mr. Carrillo, Defendants COUNTY and HART did absolutely nothing to ensure that all jail personnel were trained on protecting inmates from harm or how to conduct adequate safety checks.

34.    Defendant WELLPATH LLC/CFMG did not train their medical personnel at the Santa Cruz County Jail in accordance with their own policies.  WELLPATH LLC/CFMG has a long-standing policy, practice and custom wherein they allowed unqualified personnel to conduct critical 14 day medical and mental health assessments and allowed nurse practitioners to practice without a "scope of work" agreement with doctors, as required by California State Law.  Defendant WELLPATH LLC/CFMG did not take appropriate measures to ensure that their medical personnel were appropriately licensed or adequately trained wherein their personnel records reflect medical practitioners who were deficiently trained -or not trained at all- and did not have certifications reflecting the appropriate licenses for the work they performed at the Santa Cruz County Jail.

35.    Defendant COUNTY failed to adequately train jail mental health practitioners, including Defendant LAZAR, on their own County jail behavioral health policies in addition to the standards governing mental health and medical care in correctional facilities.  Defendant COUNTY deficiently trained jail behavioral health personnel on their risk/suicide grid which lead to adverse outcomes.  Defendant COUNTY had a long-standing practice, custom and policy of allowing personnel who were neither qualified nor held the appropriate license to conduct mental health assessments and discharge inmates from suicide watch in the jail medical unit.  Defendant COUNTY discharged TAMARIO from suicide watch on February 2, 2020 without first conducting an adequate assessment, obtaining prior authorization from the jail psychiatrist or appropriate follow-up and monitoring.  Instead, COUNTY Defendants "contracted for safety" with TAMARIO -a practice at odds with industry standards- and conducted zero follow up to include referring him to the psychiatrist

Smith, et al v. County, et al.                                                    Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

14

and medical provider after he was found with an unexplained injury to his head shortly after being discharged from the medical unit for suicide watch.

36.     Defendant COUNTY failed to adequately train Defendant LAZAR wherein he served as the county jail's only psychiatrist during the relevant time.  Defendant LAZAR did not know how to access TAMARIO's full mental health records, as maintained by the COUNTY; LAZAR did not know that he could view TAMARIO's medical records from Telecare (Santa Cruz County's W&I 5150 facility), wherein he would have seen that TAMARIO suffered from hyponatremia in December 2019; LAZAR did not know what the term "grave disability" meant in relation to W&I 5150; LAZAR did not know the standards that govern medical and mental health care in a correctional facility; LAZAR did not know that he had to obtain inmate/patients' consent for medical services, including TAMARIO's, prior to prescribing TAMARIO anti-psychotic medication; LAZAR did not know that he could access nor was he trained on how to access the JMS system which contained critical information such as inmate alerts in general and TAMARIO's IST alert, specifically.  LAZAR did not know how to order blood lab panels for inmate/patients and did not do so during the relevant time for any patient, including TAMARIO; LAZAR did not know that the jail provided mental health housing units specific for inmates who suffered from mental health issues/disease and did not know what the process was to ensure that his patient was housed accordingly, all to the detriment of inmates in general and TAMARIO specifically.

37.     Defendant COUNTY has admitted it possesses a non-delegable constitutional duty to provide medical and mental health services to inmates at the Santa Cruz County Jail.  Defendant COUNTY did not adequately monitor, supervise or assess WELLPATH LLC/CFMG's performance pursuant to their contract.  Defendant COUNTY has been on notice since 2015 wherein the Santa Cruz County Grand Jury recommended that Defendant COUNTY have dedicated oversight over WELLPATH, LLC/CFMG's provision of medical services to inmates due to a number of adverse outcomes.  Despite the harms caused by WELLPATH, LLC/CFMG's services to inmates, the COUNTY has failed to sufficiently oversee the terms of the contract or the provision of WELLPATH, LLC/CFMG services.

Smith, et al v. County, et al.                                              Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

15

38.   Defendant WELLPATH, LLC/CFMG had a policy, practice and custom of conducting zero oversight of its own medical personnel at the Santa Cruz County Jail.  Defendant WELLPATH, LLC/CFMG did not conduct any internal audits of medical services, nor did they create any reviews or reports to quantify and analyze its delivery of healthcare to the inmates at the Santa Cruz County Jail.  Defendant WELLPATH, LLC/CFMG never exercised its discretion to discipline or terminate any of its employees at the Santa Cruz County Jail when they failed to adhere to policies or deviated from the standard of care such that employees believed that they could act with impunity since their conduct and deviations from the standard of care never warranted discipline or dismissal.

39.   Defendants COUNTY and WELLPATH, LLC/CFMG maintained a chronic care program for inmate/patients at the Santa Cruz County Jail.  By contract, and by both Wellpath location specific policies, the chronic care program was expressly required to include chronic mental health issues.  However, both Defendants COUNTY and WELLPATH, LLC/CFMG did not allow inmates with mental health issues/diagnosis only, to participate in its chronic care program for no other reason than they did not permit mental health concerns to be part of the program categorically.  This long-standing practice, custom and policy to not allow inmates with mental health disorders/diagnosis to participate in the chronic care program created adverse incomes in general and to TAMARIO, specifically.   TAMARIO would have directly benefitted from the chronic care program where inmate/patients enjoy more observation, care and monitoring.  Further, Wellpath's Rule 30(b)(6) witness testified that TAMARIO would have qualified under the description of chronic care both under the contract and WELLPATH LLC/CFMG's policies, if WELLPATH LLC/CFMG had maintained its responsibilities under either.  COUNTY behavioral health also did not maintain any chronic care for inmates, despite such programs being the standard of care.  Defendants COUNTY and WELLPATH, LLC/CFMG policy to not allow inmates with mental health needs to participate in the jail's chronic care program violated policies for the COUNTY, WELLPATH, LLC/CFMG and the standard of care.

## FACTS PERTAINING TO TAMARIO'S IN CUSTODY DEATH

40.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

41.     Starting on January 30, 2020, until his death on May 10, 2020, TAMARIO was a pre-trial detainee at the Santa Cruz County Main Jail.

42.     While awaiting trial for violations of Penal Code section 273.5 and Penal Code section 166, his criminal defense attorney expressed a doubt that TAMARIO had the mental capacity to participate in his own defense.

43.     On February 14, 2020, the Superior Court of Santa Cruz appointed Dr. Katz to conduct a psychological evaluation of TAMARIO pursuant to Evidence Code section 730.  (Exhibit A, p.5-6.) Dr. Katz detailed in his report that TAMARIO had a history of Schizophrenia and that he was presently suffering a severe psychosis including auditory hallucinations that commanded him.

44. On March 4, 2020, Defendant Gerald LAZAR, M.D. ("Defendant LAZAR or LAZAR"), was serving as the County Jail's only psychiatrist on a contractor basis, through a staffing agency.  For the first time since his booking on January 30, 2020, TAMARIO was seen by a psychiatrist, Defendant LAZAR, on March 4, 2020.  Defendant LAZAR evaluated TAMARIO and determined that he was a regularly hallucinating schizophrenic, who was suffering from "bad" auditory hallucinations. Defendant LAZAR did not review TAMARIO's medical or psychiatric history, which included a long history with County Behavioral Health (both in and out of jail custody), prior W&I §5150 commitments and a history of low sodium. Instead, LAZAR relied on "patient interview," and "other providers" to inform him of limited portions of TAMARIO's medical and mental health history. Defendant LAZAR prescribed him a heavy battery of psychotropic medications without ordering a routine blood panel or reviewing any previous blood work.  From January 30, 2020 to March 4, 2020, TAMARIO received no medication nor any treatment for his constant psychosis and hallucinations, despite having been previously diagnosed with Schizophrenia by County Mental Health.  For the six weeks prior to March 4, 2020, Defendant LAZAR, and all other defendants, failed to evaluate or provide any transitional medications to TAMARIO, despite his obvious need for them.  After the

Smith, et al v. County, et al.                                                                   Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

17

March 4, 2020, appointment, Defendant LAZAR ordered that TAMARIO have a follow up visit within 2 weeks.

45.     In the criminal case, in light of Dr. Katz's March 11, 2020 evaluation, TAMARIO's defense attorney declared a doubt and the Superior Court suspended criminal proceedings pursuant to California Penal Code §1368.  (Exhibit A, p 7-10.)  The Superior Court re-appointed Dr. Katz to now evaluate TAMARIO for his competency pursuant to PC §1368.  (Id.)  The court ordered return on Dr. Katz's second report for March 26, 2020.  (Id.)

46.     On March 11, 2020, Defendant LAZAR had a patient encounter with TAMARIO and determined that TAMARIO was not improving despite the medications.  Dr. Lazar observed that TAMARIO had poor insight into his condition and was not a reliable self-reporter.  In addition to the medications that LAZAR had already prescribed TAMARIO on March 4, 2020, LAZAR ordered a new and additional anti-psychotic medication, Olanzapine.  Once again, LAZAR did not order a blood panel when he prescribed this new medication.   These same "anti-psych" medications were well documented in peer reviewed medical literature to cause hyponatremia in patients.  For that reason, regular monitoring -to include blood panels- is an essential standard of care during treatment. Defendant LAZAR admitted that he knew these medications had the potential side effect of hyponatremia.  Defendant LAZAR noted in TAMARIO's medical records, "follow up in one week." Despite his own order to see TAMARIO in one week (March 18, 2020) to determine his functionality and what impact the medications were having on him, Defendant LAZAR, completely abandoned TAMARIO, his patient, and never saw him again.  In fact, for *two months* prior to his death, no psychiatrist, psychologist or any other mental health practitioner ever saw TAMARIO again.

47.     On March 16, 2020, Dr. Katz' evaluation was filed.  It again documented that TAMARIO suffered from a severe schizophrenic psychosis.  Dr. Katz concluded that TAMARIO was incompetent to stand trial and *lacked capacity to make well-reasoned decisions regarding his mental health* and because he failed to take his medication, he should be administered anti-psychotic medication.

48.     On March 26, 2020, the Superior Court found TAMARIO mentally incompetent to stand trial pursuant to PC §1367.01(a)(1) and issued an order for TAMARIO's evaluation.  Pursuant to PC §1372(a), the court ordered that on April 9, 2020, DSH, CONREP's, contractor, DOE 2, HARPER MEDICAL GROUP, would report and recommend whether TAMARIO should be required to undergo outpatient treatment or be committed to a state hospital or some other mental health facility. (Exhibit A, p.10-12.).   Despite this finding of incompetency, Defendant LAZAR failed to see TAMARIO and evaluate his condition.

49.     Despite never seeing TAMARIO after the March 11, 2020, appointment, on April 29, 2020, Defendant LAZAR re-prescribed TAMARIO psychotropic medications without conducting any evaluation or ordering a blood panel in direct contradiction to both LAZAR's own medical recommendation, various Santa Cruz Jail provider policies and industry standards.   Defendant LAZAR, with deliberate indifference, did not evaluate TAMARIO on April 29, 2020 for the medication re-fill order, despite knowing that LAZAR should have seen TAMARIO on March 18, 2020, and that Defendant LAZAR had not seen TAMARIO on March 18, 2020 or any date thereafter. Defendant LAZAR's failure is even more inexplicable where TAMARIO suffered two medical episodes, one on April 21, 2020 and the other on April 28, 2020.  On April 28, 2020, both jail and WELLPATH LLC/CFMG staff observed TAMARIO exhibiting symptoms of over-hydration, i.e. transient neurological deficits and continuing headaches.  Defendant LAZAR was unaware of these serious symptoms because he had put no system in place to alert him of medical issues occurring to his patients.  Defendant LAZAR thereafter prescribed and re-prescribed TAMARIO a heavy panel of multiple psychotropic drugs known to the medical community to cause hyponatremia without ordering standard blood tests.  He conducted no follow up and did not assign any other medical practitioners with whom he worked to do so. Defendant LAZAR failed to participate in determining whether WELLPATH's treatment plan for TAMARIO to consume even *more* water was medically sound considering TAMARIO's medications, his schizophrenia and its common side effect of psychogenic polydipsia.  In fact, Defendant LAZAR's medical notes contain no discernable treatment plan at all other than medication.  Defendant LAZAR also failed to consider in any of his charts or notes whether

Smith, et al v. County, et al.                                                                Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

19

in addition to hyponatremia caused by the anti-psych medication he was prescribing, if TAMARIO was at risk for psychogenetic polydipsia, in which schizophrenic patients organically develop hyponatremia.  Defendant LAZAR, failed to inform any other medical or mental health provider or jail staff to limit TAMARIO's consumption of fluids due to his overt risk of suffering from hyponatremia.  Defendant LAZAR also failed to participate in any consideration of appropriate housing, whether non-disciplinary segregation was appropriate or whether TAMARIO should have been in a chronic care program.  TAMARIO died of hyponatremia and from asphyxiating on his own vomit twelve days after Defendant LAZAR's final medication order.  A simple and routine blood test would have revealed TAMARIO's low sodium levels and saved his life.  But for Defendant LAZAR's total abandonment of TAMARIO and his failure to even preform basic tasks, such as request standard blood panels, review prior histories of low sodium, assure proper monitoring or timely treat TAMARIO, TAMARIO would not have died.

50.     The Superior Court continued the matter on April 9, 2020, April 23, 2020, and May 7, 2020, each time reordering the receipt of DSH' and HARPER MEDICAL GROUP's report.  (Exhibit A, p.13-15.)   Although HARPER MEDICAL GROUP conducted an evaluation of TAMARIO, it failed to timely provide the Santa Cruz Superior Court with the relevant evaluation and instead, erroneously sent the evaluation to the Santa Clara Superior Court.   Despite Harper Medical Groups' recommendation, that TAMARIO be confined to state hospital in order to receive treatment, no transfer was possible under the March 23, 2020, DSH order that effectively terminated all transfers to the state hospital in light of the Covid-19 pandemic.

51.     Defendants LAZAR, WELLPATH LLC/CFMG and Santa Cruz Behavior Health did not provide sufficient information to custody staff regarding the nature of TAMARIO's condition such that his behavior was adequately monitored and staff was aware of the potentially fatal consequences of failing to properly monitor TAMARIO's water intake.

52.     Defendants LAZAR, WELLPATH LLC/CFMG and Santa Cruz County Defendants did not initially provide sufficient psychotropic medication to TAMARIO, and failed to monitor his medications and reactions thereto once prescribed and administered.

Smith, et al v. County, et al.                                    Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

20

53.     Defendants LAZAR, WELLPATH LLC/CFMG and Santa Cruz County Defendants knew, or should have known, information that TAMARIO suffered from a serious kidney disorder, Rhabdomyolysis and was a diagnosed schizophrenic.

54.   On April 21, 2020, medical personnel from Defendants WELLPATH LLC/CFMG and Santa Cruz County misdiagnosed and treated TAMARIO for dehydration when in fact he was hydrated.  As a result, medical staff recommended that he consume more water, despite his diagnosis of Rhabdomyolysis and Schizophrenia.   WELLPATH LLC/CFMG medical personnel prescribed TAMARIO as course of treatment that was outside their own nursing protocol.

55.     On April 28, 2020, Defendants WELLPATH LLC/CFMG observed that TAMARIO had transient neurological weakness in his right arm, a symptom of Hyponatremia and/or Rhabdomyolysis.   Despite this, Defendants LAZAR, WELLPATH LLC/CFMG and Santa Cruz County Defendants did nothing to treat TAMARIO'S symptoms and underlying condition.  In fact, on April 28, 2020, medical staff did not take even the most basic medical steps such as take TAMARIO's vital signs, conduct a complete neurological motor test, or contact an appropriate level provider to treat his neurological symptoms.

**DEFENDANTS' WELL-ESTABLISHED HISTORY OF DELIBERATE INDIFFERENCE.**

56.     Per the California Department of Justice and the California Board of State and Community Corrections, the Santa Cruz County Jail's suffers a 6.1% death rate per 100,000 bookings. In addition, the Grand Jury found that between the years 2012-2016, the Santa Cruz County Jail suffered a death rate of twice the number of expected deaths.  (Exhibit C, Another Death in Jail, Grand Jury Report.)

57.     Santa Cruz County officials, including Defendant Sheriff HART, were aware of numerous systemic problems resulting in preventable deaths in the jails, including ignoring recommendations by the Grand Jury to prevent further Constitutional violations including deaths.  (Id.)

58.     At all relevant times, HART, knew of and acquiesced to the unconstitutional practices, policies and customs that caused TAMARIO's death.  The Santa Cruz County Grand Jury has

repeatedly noticed Defendant HART regarding the unconstitutional conditions of confinement at the County's Main Jail, including but not limited to, failure to provide sufficient staff, failure to provide appropriate safety checks, failure to inspect cells, failure to provide consistent enforcement of jail contraband, failure to provide adequate mental health crisis intervention, failure to sufficiently oversee the medical services provided by its contractor, Defendant WELLPATH LLC/CFMG.   Further, Defendant HART, conducted insufficient mortality and death reviews for inmates who died in his custody pursuant to California Regulations, Title 15.   In six out of six deaths reviews, including TAMARIO's death, Defendant HART personally participated in these meetings, no notes were generated and no policies were altered in any manner all to the detriment of inmates at the Santa Cruz County jail which demonstrates a reckless and callous disregard for the constitutional rights of the inmates whose lives with which he is entrusted.   In 2019, approximately six (6) months prior to TAMARIO's death, one such inmate, German Carrillo, was discovered in his cell bed 36 hours after he was brutally murdered and placed there by his cellmates.   Mr. Carrillo's death investigation revealed that his in cell "courtesy intercom button" did not function, thus depriving him of his only possible method of calling for help.   In light of this investigation, Defendant HART did nothing to ensure the proper functioning of the "courtesy intercom buttons" within the jail, especially in regard to inmates kept in administrative segregation.

59.     At the time of TAMARIO's death, there had been a long-standing custom and practice of improper and inadequate investigations, cover-up of misconduct; and failure to discipline and train deputies and medical staff.  The Santa Cruz County Grand Jury convenes annually to conduct oversight of the County Jail and issues findings and recommendations.  Year after year, the Grand Jury reports the same issues plague the jail such as constant overcrowding, staff shortages, mandatory overtime, low correction officer morale, failure to properly supervise inmates suffering from medical and mental health issues, a need to increase reporting and documentation by the Crisis Intervention Team ("CIT") in order to more quickly identify inmates in mental distress (CIT provides mental health services to the inmates under the Santa Cruz County Health Services Agency).  And yet, despite the Grand Jury's

Smith, et al v. County, et al.                                                        Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

22

1   meticulous and regular documentation and findings, their recommendations are largely ignored by

2   Defendants, and most particularly Defendant HART.  (Exhibits C-L, Grand Jury Reports.)

3       60.     Between August 2012 and December 2015 there were seven deaths in the Santa Cruz

4   Main Jail.  (Exhibit D, Five Deaths in Custody, Grand Jury Reports.)  In August 2012, inmate Chrissy

5   Sanders was arrested for petty theft and a probation violation.  Sanders, who jail staff knew was

6   detoxing off of opioids, complained of chest pain and was sent to Dominican Hospital for an x-ray

7   and was medically cleared.  After Sanders returned to the jail, Dominican Hospital revised its

8   assessment of Sanders' lung x-ray and noted in its computer system that Sanders warranted "close

9   follow-up."  The Santa Cruz County Jail had access to Dominican Hospital's electronic records

10  program.  Sanders continued to complain of chest pain.  Five days later, Sanders experienced a seizure,

11  had trouble breathing and requested to go back to the hospital.  Santa Cruz County Jail staff refused

12  her request after consulting with a jail doctor.  After seven days of complaining of chest pain,

13  requesting medication and being refused medication by jail staff, Sanders was found by her cellmate

14  not breathing.  Sanders' died from both of her lungs collapsing due to untreated pulmonary abscesses.

15  The Santa Cruz County Grand Jury investigated her death and determined that jail corrections officers

16  ignored Sanders' clear health warnings and failed to utilize their shared medical records system to see

17  the updated information from Dominican Hospital noting "close follow-up."  The Grand Jury also

18  found that County Defendants' failure to properly staff Ms. Sanders' unit led to Defendants' inability

19  to adequately observe her clearly deteriorating condition.  The Grand Jury also found that County

20  Defendants failed to coordinate with Dominican Hospital which resulted in County Defendants

21  incorrectly diagnosing and treating Ms. Sanders.  The Grand Jury determined that medical personnel

22  at the jail never looked at Ms. Sanders' Dominican Hospital records despite its ability to do so and

23  especially where those records were updated to indicate a higher level of care for Ms. Sanders.  In its

24  report, the Grand Jury found that the Santa Cruz County Jail "did not follow accepted standards of

25  care in treating an inmate with complications arising from intravenous opiate abuse."  (Id.)

26      61.     In November 2012, Santa Cruz County Jail inmate Brant Monnett died of an

27  unintentional overdose.  (Id.)  After being booked for possession of narcotics and resisting arrest, Mr.

Smith, et al v. County, et al.                                          Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

23

Monnett told jail staff that he would be detoxing from methadone and opioids.  For the next twelve hours, jail staff noted that Mr. Monnett's speech was slurred, confused, his eyes were half-closed and he had difficulty walking.  After less than 24 hours in custody, Mr. Monnett was found dead.  Ultimately, the Grand Jury concluded that Jail staff failed to place Mr. Monnett in a sobering cell or other well supervised medical unit despite knowing that Mr. Monnett would be detoxing from opioids.  The Grand Jury concluded that CFMG had inadequate oversight and treatment of inmates in the medical unit.  (Id.)

62.     In January 2013, Bradley Drehere was arrested for criminal threats stemming from an incident where he was trying to obtain prescription medication from a medical clinic. (Id.)   A jail nurse evaluated Mr. Drehere and denied him admission.  Mr. Drehere was cleared by the hospital to return to the Main Jail where he was kept in administrative custody due to statements he made regarding his inability to get along with others.  He complained to a nurse handing out medications that he was missing several of his medications and could not take one that she had given him as in would interfere with his medication he had to take later in the morning.  Less than 48 hours after being returned to custody, a nurse discovered Mr. Drehere hanging from a noose fabricated out of a bed sheet.  The Sheriff-Coroner's office determined that the cause of death was intentional asphyxiation due to hanging.  A toxicology report found the presence of multiple anti-depressants and a valium derivative.  Although Mr. Drehere had been given a crises intervention referral, no clinician was available at the time he was booked.  The Grand Jury found that County Defendants failed to take adequate measures to ensure Mr. Drehere's safety and place him in an observation cell despite his admitted mental health issues, the fact that he was off his normal medication and had threatened violence on others.  (Id.)

63.     On July 13, 2013, Sheriff Personnel discovered the body of Amanda Sloan, a pretrial detainee at the Santa Cruz County Main Jail.  Ms. Sloan's death was ruled a suicide by intentional asphyxiation.  (Id.) However, the Santa Cruz Grand Jury found multiple systemic breakdowns that lead to her death.  Namely, the Grand Jury found that County Defendants did not conduct the hourly routine safety checks to determine whether an inmate was alive.  Secondly, the Grand Jury found that

Smith, et al v. County, et al.                                                          Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

24

the Santa Cruz Main Jail permitted inmates, including Ms. Sloan, to cover their cell windows in their solid metal cell doors in direct violation of jail rules.  Failure to observe Ms. Sloan and inspect her cell resulted in her, over the course of likely weeks, chiseling away a cement wall to expose a pipe from which she hung herself.  The Grand Jury found that Ms. Sloan's cell contained multiple violations.  More alarming, the Grand Jury found that the County corrections staff intentionally falsified observation logs for Ms. Sloan's unit on the day of her death.  The observation log noted that a corrections officer had observed Ms. Sloan's cell on five occasions on the night of her death.  However, after reviewing the video from Ms. Sloan's unit, the Grand Jury found that only one of the reported five observation checks had actually been conducted.  (Id.)  The intercom system in Ms. Sloan's cell was broken such that she could not communicate with the jail in an emergency.

64.     In November 2015, 23 year-old Kristin Deluca died at the Santa Cruz County Jail from acute heroin detox four days after being arrested for being under the influence.  (Exhibit C, Another Death in Jail, Grand Jury Report.)  Her official cause of death was determined to be acute aspiration pneumonia, dehydration and electrolyte imbalance due to protracted vomiting associated with heroin withdrawal.  In other words, Ms. DeLuca died after four days of vomiting and then inhaling her own vomit that developed into pneumonia.  The Santa Cruz County Grand Jury concluded that CFMG did not adhere to state policies where it did not specify what symptoms necessitate immediate transfer to a hospital or other medical facility.  The Grand Jury also found that the Santa Cruz County Jail was not accredited by the California Medical Association-Institute for Medical Quality.  The Santa Cruz Grand Jury strongly recommended that the County obtain independent medical oversight of CFMG and review its conduct in light of the large number of deaths in the immediate aftermath of CFMG obtaining the medical service provide contract in 2012.  (Id.)

65.     In October 2018, Tyler Luttrell was housed in the Santa Cruz County jail.  He was locked in with two people in a two-person cell for three days for 24 hours a day without any administrative review.  During that time, he was sexually assaulted by his two cellmates for 12 hours.  He did not have a functioning emergency intercom unit in his cell to signal for help.  On information and belief, for a week prior to his assault, he and one of his assailants did not appear on any safety

Smith, et al v. County, et al.                                                                    Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

25

check "pipe" logs.  On information and belief, when extracted from his cell, the safety check record for his room stated that everything was fine.  When jail staff conducted safety inspections of his cell during the assault, they never went inside, and instead fed the three inmates through the door.  Staff failed to detect multiple weapons and a tattoo kit in the cell used to threaten Mr. Luttrell and used to tattoo his face against his will.  On information and belief, other inmates in the unit heard him screaming for help and could do nothing.

66.   In October 2019, pretrial detainee German Carrillo was found dead in his cell, the result of a brutal homicide by strangulation by his two cellmates.  Santa Cruz County Jail personnel did not discover Mr. Carrillo's dead body until 36 hours after he was murdered.  On information and belief, jail staff was only alerted to inspect Mr. Carrillo's cell due to the overwhelming miasma emanating from it.  The Sheriff-Coroner's report noted that Mr. Carrillo's cell window was covered in violation of jail rules.  COUNTY defendants knew that the emergency intercom buttons in Mr. Carrillo's cell and the entire unit did not function and did nothing to fix it.  On information and belief, County Jail personnel routinely fails to go into inmate cells during hourly security checks or require inmates to come out.  Jail staff served Mr. Carrillo three meals in his cell while he was dead.  Therefore, staff is unable to adequately perceive, through the small window the true well-being of the inmates, especially in this situation where the cell window was covered.  Instead, the well-established jail practice is to merely look in the cell window and scan an electronic card on the outside of the cell door.  Jail officials placed Mr. Carrillo, who had no prior criminal history, either convictions or arrests, in a cell with two other inmates, both of whom were known violent offenders.  On information and belief, the jail staff again falsified "pipe" or safety check logs.  On information and belief, identifying information for Carrillo did not even appear on any of the safety check "pipe" logs for two months prior to his death.

67.   The Santa Cruz Grand Jury concluded that County Defendant Sheriff had failed to implement recommendations in their 2013-2014 and 2014-2015 specifically formulated to address inmate health risks and prevent inmate deaths.  (Exhibit C, Another Death in Jail.).  The aforementioned Grand Jury investigations and Reports regarding deaths at the jail noted that 25% of the inmates – in a jail with a maximum population of 311- suffered from mental illnesses requiring

Smith, et al v. County, et al.                                          Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

26

psychotropic mediations, just as TAMARIO did.  Yet, the contract between the County and WELLPATH LLC/CFMG provided an economic disincentive to the County to provide proper treatment to its mentally ill population.  Under the contract, the County was responsible for all non-emergency medical transport costs and all off-site mental health costs, including diagnostics and pharmaceuticals ordered by County mental health staff.

68.     Defendants have also paid a direct monetary price in the form of numerous lawsuit settlements which place them on actual notice of their neglectful, substandard policies.  In the 2013 jail death of Amanda Sloan by suicide, the County and CFMG together paid over a million dollars.  In the September 2015 death of Kristan DeLuca from opiate withdrawal cardiac arrest, the County and CFMG paid $2.6 million.  The County paid the family of Antonio Townsend $5.5 million for his failed suicide attempt in the jail in 2017, which left him in a permanent vegetative state.   Defendants were on actual notice of their deliberate indifference of medical and psychiatric care for persons who were housed in the County jail, like TAMARIO, but ignored pleas for corrective action until it was too late.

69.     The Santa Cruz County Grand Jury investigations found disturbing and shocking indifference.  Six of the seven jail deaths investigated by the Grand Jury took place after CFMG assumed responsibility for Jail medical care in September 2012 and resulted from CFMG's deliberate indifference to coordinating inmate health care with the County and the Santa Cruz County Health Services Agency.

70.     Most of the Grand Jury's recommendations, including "The Sheriff-Coroner should designate qualified personnel to oversee the medical services contract provisions and compliance with standards," and "The Sheriff-Coroner should obtain independent oversight of its jail medical services by medically qualified personnel," were expressly rejected by the County and Sheriff's Department. Therefore, Defendant COUNTY maintained a custom and practice of not having adequate independent expertise to oversee WELLPATH LLC/CFMG's delivery of medical services to the County jail.  The absence of quality assurance and corrective actions in WELLPATH LLC/CFMG's annual report of medical services compromised the ability of COUNTY Defendants to oversee the quality of care in the County jail.  WELLPATH LLC/CFMG has a custom and practice of lacking provisions for external

1  review by authorized investigative persons or agencies.  WELLPATH LLC/CFMG has a custom and

2  practice of not acquiring accreditations required by their contract with the COUNTY.  Without

3  accreditation, WELLPATH LLC/CFMG's adherence to standards could not be verified.

4      71.    The Grand Jury found that CFMG and the Crisis Intervention Team had inadequate

5  document procedures and lax record keeping for the mental health care of inmates.  (Id.)

6      72.    After contracting with WELLPATH LLC/CFMG, Defendant COUNTY and

7  WELLPATH LLC/CFMG established a "bi-furcated" system where the COUNTY was in charge of

8  providing mental health care and WELLPATH LLC/CFMG was in charge with providing healthcare

9  and medication distribution.  This agreement to "silo" healthcare created a system where the COUNTY

10 controlled mental health records and WELLPATH LLC/CFMG controlled medical records.  As a

11 result, providers were unable to review each other's respective records and care due to the different

12 systems that each Defendant used.

13     73.    All Defendants knew that TAMARIO was a mentally ill, emotionally disturbed person,

14 with immediate and serious medical and mental health needs, including Schizophrenia and

15 Rhabdomyolysis.  Knowing this, the jail staff intentionally locked him in a cell alone for 20 hours a

16 day with no way to communicate with anyone outside of hourly cell checks.  Further, all Defendants

17 knew that TAMARIO was a disabled individual suffering from a mental impairment that substantially

18 limited one or more major life activities such that he could not care for himself as a normal prisoner

19 could.  TAMARIO was a qualified individual with a disability for purposes of the Americans with

20 Disabilities Act and the Rehabilitation Act.

21     74.    The main jail is an indirect observation correctional facility.  The main jail has one

22 fixed "fish lens" security camera without audio capabilities in the "day room/common area" of each

23 unit.  The videos from all of the units of the jail are broadcast simultaneously on a central control panel

24 which is monitored by two guards during the dayshift and one at night.  At the same time, the guards

25 in the central command have many other tasks, such as opening all the doors, responding to

26 emergencies and other needs, often leaving individual units being unmonitored most of the time.

27

Smith, et al v. County, et al.                  Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

28

75.     The main jail does not provide in-cell visual or audio monitoring, or emergency buttons.  Each cell has a courtesy intercom button, which rarely functions or is responded to.  Each unit has a single emergency button in the day room near the exit door, which requires an inmate to be out of his cell to access.  No correction officers are stationed in the unit, and only come in to transport inmates, conduct safety checks, participate in med-pass, and switch out inmates' out hours in segregated units.  Once inmates being allowed into their day rooms are swapped out, the guards leave.

76.     Plaintiffs allege, on information and belief, that most of the "courtesy" intercom buttons in the M-Unit cells, including the button in the cell housing TAMARIO, did not work at the time of his imprisonment and death.  On information and belief, the buttons had not worked for so long in the M-Unit, with the jail staff's knowledge that inmates could no longer rely on the expectation that the buttons provided any degree of safety.  To make the situation worse, the Jail's logistics staff never conducted routine tests of the intercom system to determine which intercoms worked and which did not.  For many years prior to TAMARIO'S death, intercom buttons in the West Wing of the jail, to include the M-Unit did not reliably work.  Defendant HART is the final policy maker for the Santa Cruz County Jail.  It is the de facto policy of Defendant COUNTY to not provide functioning in-cell intercoms to inmates.  The jail also has a longstanding custom and practice of failing to provide functioning in-cell intercoms despite the preexistence of such buttons in each cell.  The jail has no records to indicate any particular intercom buttons were working because the jail has a policy to not routinely test the buttons for functionality.  The buttons have become merely ornamental and in the M Unit were visibly defaced and vandalized.  Failure to provide a functioning emergency intercom button was a moving force behind TAMARIO'S death where TAMARIO, who was actively hallucinating, became ill, could not obtain medical help from jail staff and was locked alone in his cell for approximately 20 hours a day.  This is especially true in single inmate segregation cells.  The only emergency buttons available to the inmates in the M-Unit are in the day room, which can only be accessed by inmates in the one to four hours they have out of their cell per day.  TAMARIO literally died directly under the intercom button, strongly suggesting that he was trying to push it for help while he was dying.  Even when the buttons worked, guards rarely respond in any reasonable amount of

Smith, et al v. County, et al.                                                          Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

29

time.  Defendants' policy, practice and custom of deliberate indifference towards the maintenance and inspection of emergency safety equipment was a substantial factor and moving force in causing TAMARIO'S injuries and death.  Therefore, Defendants acted with deliberate indifference to the welfare and safety of TAMARIO by having a policy, practice and custom of not providing inmates with functioning emergency buttons.

77.     As set forth above, COUNTY's main jail lacks sufficient equipment and/or staff to monitor segregated inmates including but not limited to failing to provide in cell emergency buttons, audio capabilities in the day room, and sufficient staff to monitor security cameras.

78.     COUNTY deputies and staff, including COUNTY mental health staff, and Defendant LAZAR, recklessly and with deliberate indifference, failed to appropriately classify and monitor inmates, failed to maintain properly functioning intercom call buttons, failed to provide in cell emergency buttons, failed to inspect cells and remove dangerous objects and/or liquids.

79.     COUNTY Defendants improperly classified inmates on a regular and routine basis. COUNTY defendants knew or should have known that their classification instrument was not functioning correctly which resulted in false information from the computerized system and the routine misclassification of inmates.  In addition, COUNTY Defendants maintained a custom and practice of routinely housing minimum and medium security inmates with maximum security inmates in violation of County policies.  This led to a particularly dangerous situation for TAMARIO in the M Unit, where he was housed with maximum security ex-gang members.  As a result, he was scared and frequently refused to come out of his cell for hours out.  Also, based on the jail's classification system, until TAMARIO was invited by the ex-gang members into one of their "programming" groups, he was only allowed one rather than four hours out of his cell per twenty-four hour period.

80.     Defendants failed to properly and appropriately assess and classify TAMARIO and failed to properly assess and classify his serious medical needs.  Placing an inmate with such clear special needs in non-disciplinary solitary confinement as a routine housing classification is the very definition of deliberate indifference.

81.    Defendant County contracts correctional healthcare to Defendant WELLPATH LLC/CFMG.   However, it retains the non-delegable duty to provide competent and appropriate medical care and to provide for the serious medical needs of the jail inmates.  When WELLPATH LLC/CFMG perform the County's non-delegable duties they act under color of state law.

82.    At all relevant times, Defendant COUNTY contracted its mental health care and/or psychiatric services to Defendant LAZAR.  Defendant COUNTY similarly retains the non-delegable duty to provide competent and appropriate mental healthcare and to provide for the serious mental health needs of the jail inmates.  When GERALD LAZAR, M.D. performs the County's non-delegable duties he acts under color of state law.

83.    WELLPATH LLC/CFMG, GERALD LAZAR, M.D,, and DOES 4-40, recklessly and with deliberate indifference, failed to immediately and appropriately respond to TAMARIO'S medical and mental health needs; specifically by not correctly diagnosing him on April 21, 2020 or April 28, 2020.  WELLPATH LLC/CFMG and DOES 31-40 instead instructed TAMARIO to consume *more* water despite his symptoms, his documented history of suffering from both Rhabdomyolysis and Schizophrenia, causing TAMARIO to suffer a horrendous final episode of vomiting that then resulted in his death.

84.    Upon information and belief, Defendant County failed to institute proper procedures and training to coordinate inmate assessments, placements, classifications, psychotropic medications and medical care with WELLPATH LLC/CFMG staff, jail physician, jail psychiatrist, court, and jail corrections staff where there was an obvious need for such in order to prevent deaths, such as occurred here.  These include, for example, jail understaffing, denial of appropriate medical and mental health care, and contracting to create financial and other incentives to deprive patients and inmates of necessary emergency and hospital care, and by failing to require that all medical/psychiatric staff and supervisors be properly trained, supervised, credentialed and licensed as required by law.  The Grand Jury found a custom and practice of not sufficiently staffing the jail's Crisis Intervention Team ("CIT") to determine an inmate's needs for immediate mental health medication and monitoring during intake at the main jail.  It also found a custom and practice of Defendants' failing to properly document

classification decision to include consultation with medical and mental health providers in violation of County policies.  Lastly, The Grand Jury found that Defendants maintained a custom and practice of failing to have procedures for monitoring inmates' younger than 65 potential need for a higher level of care.

85.     With reckless and callous disregard for his safety, individually named Defendants and DOE Defendants 4-40 failed to properly house, classify, inspect and take reasonable measures to observe and check on TAMARIO'S cell for his safety and protection –all as required by law, regulations and generally accepted standards.  The Grand Jury found that Defendant COUNTY maintained a custom and practice of not conducting adequately frequent cell inspections and not consistently enforcing rules governing items permitted in cells by jail staff.  Plaintiffs allege, on information and belief, that Defendants not only permitted TAMARIO to drink copious amounts of water, but encouraged and instructed TAMARIO to do so, despite the known fatal consequences of rhabdomyolysis and hyponatremia, which is regularly associated with antipsychotic medication. TAMARIO made statements regarding his desire to drink cleaning fluid and County Defendants permitted TAMARIO, a known active schizophrenic, to have access to cleaning fluid from an unsecured and dirty mop bucket.  TAMARIO was seen on video taken from the M-Unit taking pink cleaning fluid from the mop bucket.  Plaintiffs allege, on information and belief, that County Defendants knew that TAMARIO, or at least some inmates, consumed cleaning fluid in the days and hours prior to his death and did nothing to prevent him from doing so.   Defendant HART is the final policy maker for the Santa Cruz County Jail.

86.     The California Board of State and Community Corrections, Title 15, Division 1, Chapter 1, Subchapter 4, Section 1027.5 requires hourly direct visual safety checks for inmates.  Santa Cruz County Jail policy Manual section 503.3 requires, "Safety checks shall be done by personal observation of the correctional officer and shall be **sufficient to determine whether the inmate is experiencing any stress or trauma.**"   It is the customary practice, despite the foregoing official written policy, of jail personnel to routinely not conduct safety checks in a manner consistent with the jail policy "to determine whether the inmate is experiencing any stress or trauma."   In practice,

corrections officers almost never enter the cell.  Sometimes they merely look through the small window, assuming the window is not obstructed. Often, they just walk by without even looking in the cells after touching an electronic device to indicate they walked past. Safety checks on inmates with mental health disorders were done no differently than on inmates without mental health issues. Therefore, if the inmates were seen to be breathing, this was all the checking that would occur.  This conscious decision to quickly peek in through the small window, assuming it is not obstructed, does not provide sufficient information to determine whether the inmate is experiencing stress or trauma. Many safety checks of entire units took less than five minutes.  Moreover, the safety checks that are conducted are only perfunctory.  When the "pipe" logs reflect the safety check of an individual, it is often only that the guard scanned a card on that tier of the Unit, and did not necessarily even look in the cell.  The logs were preset to only state that the inmate and cell were ok, even in cases where the inmate was dead.

87.   Defendant COUNTY maintained a custom and practice of  failing to adequately store, inspect and remove contraband and dangerous materials from the open area of the unit and from individual cells such as corrosive cleaning fluid, constituted unreasonably dangerous conditions.  In fact, defendants regularly left a mop bucket with hazardous chemicals in it accessible to any inmate, including those all Defendants knew could not care for themselves and make safe behavioral decisions. Guards would literally bring in to the units, sometimes diluted/sometimes undiluted Neutra Tec 64, and permit inmates to dip there cups in it.  Custody staff knew or should have known that multiple inmates were drinking the cleaning fluid, particularly those with mental health conditions.  On information and belief, prior to TAMARIO's death, a separate inmate drank Neutra Tec, stating to others it cleaned him out and made him stronger, and collapsed in the shower.  On information and belief, as a result of this brazen violation of their own policies and California regulations, TAMARIO consumed toxic chemicals in addition to over-hydrating.  All COUNTY Defendants, and DOE Defendants 4-50, were deliberately indifferent to the enhanced risk and danger to TAMARIO from these dangerous conditions in and around his jail cell.

88.     Much of this deliberate indifference stems from County Defendants decades long practice of understaffing the jail with corrections officers.  This policy understaffing has occurred for many years prior to TAMARIO's incarceration and death.  The Santa Cruz Grand Jury noted the understaffing problem in several reports, including its present 2020-2021 report.  The Grand Jury has repeatedly noted that the understaffing has resulted in low employee morale, mandatory overtime, and exhausted workers who are unable to do the job required of them.  The consistent response of County Defendants to the Grand Jury's staffing recommendations has been to refuse to implement any of them.  In Defendant's most recent Grand Jury recommendation, both the Defendant HART and the County responded that Grand Jury recommendations as to staffing would not be implemented because insufficient staffing was covered by mandatory overtime.  Mere weeks after their responses to the Grand Jury, the Sheriff closed the female corrections facility and significant portions of the County's Medium Security facility because **the Sheriff was short 30 corrections positions**.  (Exhibits, K, L). The Sheriff moved all those inmates back into the main jail, which has a 30-year history of overcrowding.

89.     Additionally, COUNTY Defendants, including SHERIFF HART, COUNTY MENTAL HEALTH, COUNTY BEHAVIORAL HEALTH, GERALD LAZAR, M.D., intentionally failed to provide adequate mental health services to TAMARIO, who was a diagnosed schizophrenic who also suffered from Rhabdomyolysis.  The aforementioned Defendants failed to take reasonable measures to ensure that TAMARIO'S health was treated with medication and in accordance with community standards as required by law and regulations.  ALL COUNTY Defendants, including SHERIFF HART, COUNTY MENTAL HEALTH, COUNTY BEHAVIORAL HEALTH, WELLPATH LLC/CFMG, GERALD LAZAR, M.D., and DOES 4-40, all failed to properly and adequately monitor and care for TAMARIO'S safety to abate the risk of death, despite the fact that a reasonable officer and county official in such circumstances would have appreciated the high risk to TAMARIO given his dual diagnosis as a schizophrenic suffering from a "severe" psychosis and Rhabdomyolysis, his inability to make appropriate judgments about his own medical and health needs,

Smith, et al v. County, et al.                                                    Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

34

his unfettered access to water, coffee, and cleaning fluids and the failure to provide functioning intercom so that TAMARIO could summon medical/jail personnel for help.

90.     Pursuant to policies and procedures set by all Defendants TAMARIO received no follow-up medical care despite the obvious signs that he was suffering from hyponatremia.

91.     County Defendants were deliberately indifferent to TAMARIO'S serious medical need by failing to set forth procedures on proper care of inmates including mandates that inmates who suffer chronic psychosis, who are incompetent to stand trial, and who suffer symptoms of potential hyponatremia be observed in the Main Jail's medical unit and mandates that inmates be monitored regularly by a medical doctor.

92.     Upon information and belief, Defendant County failed to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs and procedures described in this Amended Complaint when the need for such was obvious, with deliberate indifference to the rights and safety of TAMARIO and the public, and in the face of an apparent need for such policies, procedures, and training programs.  In the alternative, upon information and belief, Defendants County and WELLPATH LLC/CFMG may have instituted polices or training to address some or all of the topics above, but with deliberate indifference to individual rights, and failed to properly oversee, enforce and properly carry out such policies and training.

93.     Defendants maintained a custom and practice of not placing severely mentally ill inmates in the chronic care program despite its contractual obligations to each other and despite WELLPATH LLC/CFMG policies providing for inmates with Schizophrenia and/or psychosis to be placed in a chronic care program.  This contractual violation also extends to not housing TAMARIO and other seriously mentally ill inmates in a mental health unit,  and not housing him/them in the medical unit.  Instead, often without documented consultation with mental health professionals, the jail housed TAMARIO and other seriously mentally ill inmates in segregation units full of maximum security inmates, who faced charges up to and including murder.

94.     Defendants and their employees and agents, knew or should have known that TAMARIO was at risk of harm by failing to take appropriate and adequate measures to ensure his safety by keeping him under constant observation in an appropriate safety cell; monitoring him continuously by video, checking on him at irregular intervals every thirty minutes and providing him with appropriate housing where he did not have unfettered access to water, coffee and poisonous chemicals.

95.     All Defendants' actions and omissions and the manner and duration in which TAMARIO was incarcerated was contrary to law and generally accepted practices and jail procedures, causing the wrongful death of TAMARIO.

96.     TAMARIO'S death was the result of all Defendants' wrongful conduct, deliberately indifferent denial of necessary and appropriate medical and psychiatric care, failure to provide competent medical and psychiatric care, failure to communicate his substantial risk of harm to other mental health, medical and custodial staff, failure to house him in a safety cell and under constant observation, and other conduct that under these circumstances was contrary to generally accepted reasonable jail and medical procedures and standards.

97.     Concurrently, TAMARIO's death was the proximate result of Defendants County, HART and WELLPATH LLC/CFMG's failure to reasonably train their custody, medical, and mental-healthcare staff in the proper and reasonable care of mentally ill inmates, failure to implement and enforce generally accepted lawful policies and procedures at the jail, failure to institute appropriate training, policies and procedures to prevent suicide, and their deliberate indifference to the serious medical and psychiatric needs of TAMARIO.  These substantial failures reflect Defendants County and WELLPATH LLC/CFMG's policies implicitly ratifying and/or authorizing the deliberate indifference to serious medical needs by their custody, medical and mental-healthcare staff and their failure to reasonably train, instruct, monitor, supervise, investigate, and discipline custody, medical, and mental-healthcare staff employed by these Defendants in the handling of mentally ill inmates.

98.     Furthermore, Plaintiffs are informed and believe and thereon allege that Defendants County and WELLPATH LLC/CFMG allowed inappropriately credentialed staff to perform medical

Smith, et al v. County, et al.                                          Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

36

assessments, mental-health assessments on patients without any appropriate clinical supervision by a properly licensed and credentialed health care provider, in violation of California law and generally accepted national standards, and because it costs significantly less money than paying properly licensed staff to do the work.

99.    At all material times and, alternatively, the actions and omissions of each Defendant were intentional, and/or wanton and/or willful, and/or conscious shocking, and/or reckless, and/or callous, and/or malicious, and/or deliberately indifferent to Plaintiff's and Decedent's rights, and/or grossly negligent, and/or negligent.

100.    As a direct and proximate result of each Defendant's acts and/or omissions as set forth above, all Plaintiffs sustained the following injuries and damages, past and future, including, but not limited to:

        a.  Wrongful death of TAMARIO SMITH.

        b.  Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace and moral support.

        c.  Emotional distress from the violations of their personal Constitutional rights, including grief, sorrow, anxiety, sleeplessness, humiliation, and indignity;

        d.  Loss of enjoyment of life;

        e.  All other legally cognizable special and general damages, including but not limited to punitive damages;

        f.  Violations of state and federal constitutional rights; and,

        g.  All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, California Civil Code §§ 52 and 52.1, and as otherwise allowed under California and United States statutes, codes, and common law.

101.    As a direct and proximate result of each Defendants' acts and/or omissions as set forth above, Plaintiffs FELICIA SMITH and MICHAEL WARREN-SMITH, as co-Successors in Interest of Decedent TAMARIO SMITH, sustained the following injuries and damages, past and future, including, but not limited to:

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

37

a.   Coroner's fees, funeral and burial expenses;

b.   TAMARIO's loss of life,  pursuant to federal civil rights law;

c.   TAMARIO's conscious pain and suffering, pursuant to federal civil rights

law; and

d.   All other legally cognizable special and general damages, including but not limited

to punitive damages

e.   All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988,

California Civil Code §52, and as otherwise allowed under California and United

States statutes, codes and common law.

**FIRST CAUSE OF ACTION**
**(Deliberate Indifference to Serious Medical Needs (42 U.S.C. §1983))**
**ALL PLAINTIFFS AGAINST DEFENDANT GERALD LAZAR**

102.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in this complaint, as though fully set forth here.

103.    By actions and omissions described above, Defendant GERALD LAZAR, M.D., acting under the color of state law in his individual capacity, knew or should have known that, TAMARIO suffered from severe schizophrenia and psychosis.  As a result, Defendant LAZAR knew, or should have known, that TAMARIO required treatment, observation, and monitoring.  Defendant LAZAR failed to provide TAMARIO the necessary and required treatment, observation and monitoring which violated TAMARIO'S Fourteenth Amendment right to medical care.

104.    Defendant LAZAR knew or should have known that TAMARIO faced serious medical and mental health needs.  LAZAR knew or should have known that TAMARIO suffered from schizophrenia with severe psychosis and Rhabdomyolysis.  Defendant LAZAR failed to review TAMARIO's recent medical records evidencing that TAMARIO had suffered from hyponatremia. LAZAR failed to take critical steps to ensure that he was treating TAMARIO properly and in accordance with the standard of care where LAZAR failed to take TAMARIO's vital signs, order blood panels or obtain patient consent prior to medicating TAMARIO with a battery of anti-psychotic medication.

105.     Defendant LAZAR knew or should have known that TAMARIO required observation, treatment and monitoring when he took the deliberate course of action of prescribing TAMARIO medications that included anti-psychotics drugs that have side effects, to include, hyponatremia.  After prescribing TAMARIO medications, including a new medication, on March 11, 2020, LAZAR took a deliberate course of action when he failed to follow up with and/or see TAMARIO as ordered in his own note.  LAZAR knew that TAMARIO needed to be seen, observed and monitored after March 11, 2020.  Yet, LAZAR never saw TAMARIO again.  On April 29, 2020, Defendant LAZAR reviewed his prior March 11, 2020 note wherein he ordered that TAMARIO be seen by him within one week.  On April 29, 2020, in light of his review of TAMARIO's mental health record, LAZAR knew that TAMARIO had not been seen by him or any other psychiatrist or mental health provider.  Nonetheless, on April 29, 2020, LAZAR took a deliberate course of action wherein he re-prescribed TAMARIO the same host of drugs without conducting an assessment, obtaining any vital signs or blood panels to determine if TAMARIO was indeed tolerating, much less improving, on the prescribed medications.  Knowing the severe risk of harm that TAMARIO faced when he prescribed these medications, LAZAR did nothing to ensure that TAMARIO was properly monitored, observed or treated.

106.     On May 4, 2020, TAMARIO sent a written request to mental health to be seen due to his medications, "not working."  LAZAR knew, or should have known, that his patient, TAMARIO had not been seen in nearly two months from his last psychiatric visit and needed to be seen about his medications.  Defendant LAZAR did not see or evaluate TAMARIO in light of his request.

107.     Defendant LAZAR knew of the severe risk that faced TAMARIO when LAZAR prescribed TAMARIO medication that LAZAR knew could cause hyponatremia.  Defendant LAZAR knew, or should have known, that schizophrenia can cause psychogenic polydipsia in some individuals.  Knowing the severe risk of harm that TAMARIO faced, Defendant LAZAR did nothing to ensure that TAMARIO's fluid consumption was monitored or limited in order to prevent TAMARIO from suffering from hyponatremia.

108.     Defendant LAZAR, knew or should have known, that LAZAR's failure to take reasonably available measures by providing TAMARIO with basic medical observation, monitoring,

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

39

care and treatment would result in severe injury and/or death, as it did in TAMARIO's case, wherein TAMARIO died of low blood sodium, i.e. hyponatremia.

109.    By the actions and omissions described above, the individually named Defendant violated 42 U.S.C. §1983, depriving Plaintiffs and Decedent of the following well-settled constitutional rights that are protected by the Fourteenth Amendment to the United States Constitution:

      a.  The right to be free from reckless disregard for the substantial risk of serious harm to TAMARIO's medical needs while in custody and confined in jail as a pretrial detainee with a severe mental health disorder, as secured by the Fourth and Fourteenth Amendments;

      b.  The right to be free from wrongful government interference with familial relationships and Plaintiffs' right to companionship, society, and support, as secured by the First and Fourteenth Amendments.

      c.  The right of a mental health inmate to receive rehabilitative services and adequate medical services.

110.    Defendant LAZAR's failure to intervene, prevent, or stop the constitutional violations by others, of which each listed Defendant knew or must have known, and when each listed Defendant was in a position to so intervene when such violations were occurring, also renders such Defendant(s) liable for these violations.

111.    Defendant LAZAR subjected Plaintiffs to his wrongful conduct, depriving Plaintiffs and Decedent of the rights described herein, knowingly, maliciously, and with deliberate indifference and conscious and reckless disregard for whether the rights of Plaintiffs (individually and on behalf of TAMARIO) and others would be violated by his acts and/or omissions.

112.    As a direct and proximate cause and substantial factor of the foregoing wrongful acts and/or omissions, Plaintiffs sustained injuries and damages, as set forth above in ¶¶ 100-101.  Plaintiffs are therefore entitled to general and compensatory damages in an amount to be proven at trial.

113.    In committing the acts alleged above, Defendant LAZAR acted maliciously, oppressively, and/or with reckless disregard for the rights, safety, medical needs and well-being of Plaintiffs and Decedent, and by reasons thereof, Plaintiffs are entitled to punitive damages and penalties allowable under 42 U.S.C. §1983, California Code of Civil Procedure §§377.20 et seq., and

Smith, et al v. County, et al.                                    Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

40

other state and federal law against these individual Defendants; no punitive damages are sought directly against the municipal Defendants.

114.     Plaintiffs are also entitled to reasonable costs and attorney's fees under 42 U.S.C. §1988 and other applicable California codes and laws.

## SECOND CAUSE OF ACTION
### (Right of Association (42 U.S.C. §1983))
### By Plaintiffs Felicia Smith and Michael Warren-Smith against ALL DEFENDANTS

115.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

116.     Defendants COUNTY, HART, WELLPATH LLC/CFMG AND LAZAR deprived TAMARIO of his rights under the United States Constitution to due process of law and denied him medical care.

117.     Defendants COUNTY, HART, WELLPATH LLC/CFMG AND LAZAR's denial of medical care to TAMARIO proximately caused TAMARIO's death, consequently terminating and destroying the parent-child relationship between TAMARIO and his parents, Plaintiffs Felicia SMITH and Michael WARREN-SMITH.

118.     There was no legitimate penological interest in failing to communicate critical medical information, including but not limited to, conducting appropriate observation, monitoring and treatment to TAMARIO.  Defendant COUNTY failed to provide TAMARIO with appropriate mental health and medical care while he was incarcerated at the Santa Cruz County Jail.  Specifically, Defendant COUNTY failed to adhere to institute appropriate medical and mental health treatment at the jail, failed to have appropriately licensed staff conduct mental and medical assessments, failed to have a medical record keeping system that could be accessed by all medical and mental health providers and failed to adhere to County policies as well as national standards regarding the provision of healthcare in a correctional facility.

Smith, et al v. County, et al.                                                 Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

41

119.   Defendant LAZAR prescribed TAMARIO anti-psychotic medication without reviewing his prior medical history that included a recent history of hyponatremia, obtaining any vital signs, ordering any blood labs or follow-up.  Despite Defendant LAZAR's specific order to see TAMARIO in "one week," Defendant LAZAR never saw TAMARIO again and failed to ensure that TAMARIO was seen by any psychiatric provider, thus completely abandoning his patient, TAMARIO.  With deliberate indifference, Defendant LAZAR's denied TAMARIO access to medical care when  he left TAMARIO, who was in obvious mental health distress, unattended, with unfettered access to water, coffee and cleaning fluids, vomiting all over his cell without a working emergency button.  Defendant's actions shock the conscience.

120.   Defendant WELLPATH LLC/CFMG failed to properly assess, treat and care for TAMARIO when WELLPATH LLC/CFMG staff treated TAMARIO for headache and neurological systems by encouraging him to drink more water, when he was overly hydrated, and not sending him to a medical doctor for treatment.

121.   Defendants COUNTY, HART, WELLPATH LLC/CFMG AND LAZAR subjected Plaintiffs Felicia SMITH and Michael WARREN-SMITH to their wrongful conduct, depriving Plaintiffs and Decedent of the rights described herein, knowingly, maliciously, and with deliberate indifference and conscious and reckless disregard for whether the rights and safety of Plaintiffs  and others would be violated by  their acts and/or omissions.  The aforementioned acts and/or omissions of Defendant LAZAR was deliberately indifferent to TAMARIO's serious medical needs, health and safety; violated TAMARIO's civil rights; caused the untimely and wrongful death of TAMARIO; deprived Plaintiffs FELICIA SMITH and MICHAEL WARREN-SMITH of their liberty interest in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

122.    The deprivation of the rights alleged above has destroyed the Constitutional rights of TAMARIO'S parents, FELICIA SMITH and MICHAEL WARREN-SMITH, to the society and companionship of their son which is protected by the substantive due process clause of the Fourteenth Amendment.

123.    The conduct alleged herein violated TAMARIO's rights alleged above thereby resulting in a deprivation of Plaintiffs' rights as set forth above in ¶¶ 100-101 which has legally, proximately, foreseeably, actually and a substantial factor, caused Plaintiffs to suffer emotional distress, pain and suffering, and further damages according to proof at the time of trial.

### THIRD CAUSE OF ACTION
### (42 U.S.C. §1983-Failure to Prevent Violations of Law In Subordinates)
### ALL PLAINTIFFS AGAINST DEFENDANT HART

124.    Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

125.    Defendant HART, in his individual and official capacity, was at all times acting under color of law during the relevant period of time.

126.    Defendant HART violated TAMARIO SMITH'S rights under 42 U.S.C. § 1983 to prevent violations of the law in his individual capacity including but not limited to the following categorical manners, which will then be detailed below:

a.    Failure to Conduct Any Inward Facing Investigations (the Jail's Staff and System Responsibility) in Deaths at the County Jail to include but not limited to six out of six consecutive In Custody Death Reviews from 2018 to 2020.

b.    Failure to train, discipline, investigate any unconstitutional practices as identified by the Santa Cruz County Civil Grand Jury from 2013 to 2021; and

c.    Failure to Train, Oversee, Supervise and Discipline Staff.

**FAILURE TO INVESTIGATE**:

127.    Defendant HART, in his official capacity, is the Sheriff of Santa Cruz County.  He is responsible for coordinating all operations at the various County jails, for making corrections policies, and for reporting to the Board of Supervisors regarding issues at the Jail.  Sheriff HART, in his personal capacity, possesses a nondelegable duty to provide care, medical and mental health services and a custodial setting that comports with the requirements of the Eighth and Fourteenth Amendments to the United States Constitution.

128.    Defendant HART has chosen, in his discretion, to delegate or partially delegate some of his duties and obligations at the jail to his subordinate lieutenants.   For example, at the Santa Cruz County jails, various lieutenants are initially responsible as the point person for corrections health liaison with WELLPATH, LLC., CFMG, operations, maintenance, housing, classification, etc. However, JAMES HART retains the power to makes all decisions concerning operations and set all policies.

129.    Defendant HART participates in an individual and personal capacity in all In Custody Death Reviews (ICDRs).  Title 15 of the California Code of Regulations and the COUNTY's own correctional policies require County's to hold a mandatory in custody death review for all jail deaths to determine whether any policy or lack thereof might have been a substantial factor in the death of an inmate.

130.    The County is required to compile a group of corrections staff, investigative staff, medical staff, mental health staff and the coroner to review the circumstances surrounding an inmate's death, determine whether any policies or lack thereof are implicated and determine if any policies need to be added, deleted or amended in an effort to prevent future death.

131.    In six out of six consecutive in custody death reviews (ICDR) from 2018 to 2020, including TAMARIO's, Defendant HART was personally present and at all times leading the group

Smith, et al v. County, et al.                                                    Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

44

and personally making decisions as to the nature and substance of the inquiry in the ICDRs.  Defendant

HART is also responsible for any investigations that take place before and after the ICDR, including

but not limited to, who appears, what information is required to be presented, and any alterations to

policy, concerning corrections' policies which, HART is the final policy maker.

132.     In all six ICDRs held from 2018 to 2020, Defendant HART failed to conduct, or require

to be conducted, any self-facing or internal investigations regarding policies, practices or staff conduct

and performance that contributed or caused the in-custody deaths.  In other words, Defendant HART

does not require any of his subordinates to investigate whether policies may have contributed to in

custody deaths, which is the entire purpose of the event.  The meeting is only a very general

presentation of treatment from various custodial providers all with an incentive to make their care look

adequate.  The entirety of the Sheriff's own investigations only relate to the medical cause of, as well

as the time, manner and place of the death and an investigation of whether the death was the result of

any crimes that needed to be forwarded to the district attorney.

133.     Defendant HART did not even request WELLPATH, LLC/CFMG's own self-critical

mortality report or the information contained within them, even though this information is required by

contract and is highly relevant to the inquiry.  Defendant HART failed to require the drafting of one

policy change, produce one note or document from any attendee in relation to all six ICDRs creating

a review process that existed in name only.  (See Exhibit B-C.)  Defendant HART did not request or

require any department of the County interacting with the deceased inmates prior to death to critically

evaluate the care received, or custodial circumstances encountered by the inmate.

134.     At the Santa Cruz County jail, while ICDR meetings are held, the inquiry is a

completely sham proceeding meant only to give the appearance of an investigation in compliance with

Title 15.  In fact, it is simply a formal and intentional process to provide cover for any institutional

wrongdoing.  Defendant HART personally presided over and led these six ICDR meetings that were

Smith, et al v. County, et al.                                                     Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

45

expressly calculated with the intention to NOT identify any specific substantive policies, to substantively alter or add any policies, or to reveal any self-critical information related to the correctional circumstances, especially systemic circumstances, of any in custody death.

135.     In the six of six ICDRs:

a.   Not one piece of paper on which information was conveyed was created to be evaluated by the group or by anyone;

b.   Not one policy was identified to be substantively evaluated let alone changed or added, including a death where an inmate was not found in his cell bed for 36 hours after his death;

c.   Not one piece of paper was created during the meeting and not one note was taken;

d.   Not one morbidity report was requested from WELLPATH, LLC/CFMG, despite it being contractually obligated to provide them; and

e.   Not one report was created as a result of the ICDRs nor any further investigations conducted or recommended.

136.     In TAMARIO's circumstance, there are various policies that were logically implicated in his death that should have resulted in significant attention under any reasonable circumstance. During the course of discovery, Plaintiffs learned the following based on COUNTY and WELLPATH, LLC/CFMG witness testimony and documents.   If HART would have required a thorough investigation of TAMARIO'S death as part of the ICDR process, he would have discovered the following:

a.   The COUNTY does not know why TAMARIO was placed in the "M" (Gang drop out) protective custody segregation unit, where he clearly did not belong and where he died. The COUNTY does not know who put TAMARIO in the segregation unit.  No one evaluated

Smith, et al v. County, et al.                                                Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

46

whether he should have remained there for over a month.  The foregoing are all examples of clear violations of the Special Management and Classification policies.

b.   Corrections routinely did not conduct segregation health checks, either medical or mental health, of inmates in protective custody segregation as required by its Special Management policy.

c.   Corrections did not maintain daily logs of any segregated inmates as required by the Special Management policy.

d.   Corrections do not use or train its officers on two of the three mental health related safety alerts that appear in its Classification policy, all of which applied to TAMARIO.

e.   The two corrections officers that monitored TAMARIO on safety checks on the date of his death thought something was "off" about his behavior but were not trained to either identify or report mental health issues and did not, in fact, report them.

f.   No one checked to see if TAMARIO's in cell intercom was working of if he tried to use it considering he died with his face smashed against the wall right under it.  The intercom was the only way for TAMARIO to communicate to staff from his cell when staff were not in the housing M unit, which was the vast majority of the time.  This pattern has been the basis of many previous lawsuits, grand jury reports and played a significant part in another of the six deaths.  The jail was also well aware that the intercom system had regular systems' failures in the M Unit's wing (West Wing) and was determined by its vendor to be irreparable months before TAMARIO's death.

g.   Corrections, for years, openly flouted it policy that custodial equipment and materials are to be kept in a locked closet and use monitored.  The Coroner's report detailed that the M unit video showed TAMARIO scoop dirty chemical laden mop bucket water into a drinking vessel.  He died with soap-bubble emesis all over his face.  Postmorten testing

Smith, et al v. County, et al.                                                          Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

47

confirmed the presence of the cleaning fluid chemicals in TAMARIO'S stomach.  No one discussed the clear and regular violation of this policy of allowing inmates ready access to the mop bucket into the units and leaving it there all day unmonitored.

h.    No consultation occurred between JBH, medical and corrections staff prior to removing TAMARIO from a mental health unit to a protective custody segregation unit as required by several policies including the corrections Special Management, JBH and WELLPATH, LLC/CFMG policies.

i.   HART did not ask or require Gerald Lazar, M.D. to participate in the ICDR, despite the fact that LAZAR was TAMARIO'S treating psychiatrist.  No one asked Defendant LAZAR why he did not see TAMARIO for two months after his report said he need to be seen in one week.  No one asked JBH why they did not see TAMARIO after February 26, 2020 up to and including his his death on May 10, 2020.  No one asked why LAZAR was prescribing anti-psych meds without consent, patient education, labs or follow up monitoring.

j.    Defendant WELLPATH, LLC/CFMG did not explain why their site-specific policies say they provided mental health care when they do not.

k.   Defendant HART did not require anyone to explain why mental health and medical maintain a completely siloed records system where neither entity can see each other's records at all. HART did not ask how that effects health care delivery in the jail, especially where TAMARIO was dying of hyponatremia and simultaneously being ordered by WELLPATH to drink at least five cups of water a day without limitation.

l.   Defendant WELLPATH, LLC/CFMG employees including its own health services administrator and nurse practitioner did not have any credentialling documents in their personnel files that would permit them to practice medicine at the SCCJ on anyone.

Smith, et al v. County, et al.                                          Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

48

m.   TAMARIO did not see one medical doctor despite having a consistently high pulse, headaches and neurological failures.  WELLPATH, LLC/CFMG's Rule 30(b)(6) witness, who was present at the ICDR, testified that TAMARIO should have seen a provider on at least four occasions where he did not and should have seen a doctor for the neurological failures which occurred within days of his death.  The same witness testified that in terms of her presentation at the ICDR, she was not asked any critical questions and was only required to give a very general overview of medical contacts with TAMARIO.

n.   The County contract and WELLPATH, LLC/CFMG policies require TAMARIO and other chronic suffers of mental health ailments to be treated as chronic care patients.  However, despite the policies and contractual obligation, there is no chronic care categorically for inmates who only suffer from chronic mental health related illnesses.  HART never made any inquiries into these policies.

137.   As a result of failing to conduct any real investigation as required by Title 15 into policies involving county staff, county contractors and their systems operating in the main jail in the six of six deaths, Defendant HART simultaneously made it impossible to supervise, train on, or discipline any of the myriad open violations of already existing Corrections, JBH and WELLPATH, LLC/CFMG policies or take any remedial action to prevent violations in the future.

**FAILURE TO TRAIN, SUPERVISE AND DISCIPLINE**

138.   The Fourteenth Amendment to the United States Constitution does not permit HART to simultaneously fail to take obvious and statutorily required steps to become aware of significant standard of care/policy violations under his command and then escape responsibility for failing to train, supervise, discipline by simply not attempting to learn about the problems.  For example, German Carrillo died in the fall of 2019, seven months before TAMARIO.  After his death, 36 safety checks failed to discover his corps in his own bed.  His intercom did not work.  Multiple classification

Smith, et al v. County, et al.                                                           Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

49

and special management policy violations occurred.  None of the foregoing or any specific policies were discussed at Mr. Carrillo's ICDR.  As a result, no policies were identified, changed and no further training was conducted.  Unsurprisingly, seven months later, Tamario Smith received insufficient safety checks, no one checks his intercom, and special management and classification policies were openly flouted.

139.   In addition to failing to conduct any meaningful ICDR's, Defendant HART intentionally failed to conduct any substantive inquiry into catastrophic injuries at the county jail. Santa Cruz County inmate Antonio Townsend suffered a catastrophic injury in 2018 in a failed suicide by asphyxiation.  Mr. Townsend was a mental health patient who was improperly housed in segregation and hung himself.  He is now in a permanent vegetative state.  Mr. Townsend did not have a proper health/mental health intake and was essentially permitted to house himself in a single segregated cell.  Like Mr. Townsend, TAMARIO also had incomplete intake screenings and health assessments because of his inability to participate rationally.  TAMARIO was improperly placed in a segregation cell without documentation, reason or review.   All of these issues are well worn patterns stemming from Defendant HART as an individual and the active leader of the group refusing to require investigations and refusing to address issues even when they came to light in alternative settings.

140.   Defendant HART failed to train, supervise and discipline custodial staff in the performance of their duties in observing, monitoring and caring for inmates at the Santa Cruz County Jail.  Through Grand Jury reports, ICDRs and prior litigation, Defendant HART was personally aware, or reasonable should have been aware, that correctional staff was not conducting safety checks in accordance with Title 15 as well as the SCSO policies for years prior to TAMARIO's death.  Several Santa Cruz County Jail inmates, namely Amanda Sloan, Tyler Luttrell and German Carrillo, were injured or died due to significant and material lapses in the correction officers' failures to observe, monitor and protect inmates as set forth in Grand Jury reports from 2013 to 2021.  Defendant HART

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

50

1

2

3

knew of the circumstances surrounding these individuals' injuries and deaths.  In light of the adverse outcomes, Defendant HART did not take appropriate measure to ensure that custody staff were appropriately trained in the supervision and monitoring of inmates at the county jail.

4

5

6

7

8

9

10

141.    Correctional staff conducting safety checks on TAMARIO testified that they did not have any mental health training in recognizing signs and symptoms of mental health disorders such as schizophrenia.  The correctional staff did not have training and, therefore, could not properly observe or monitor inmates who were incompetent to stand trial or suffering from severe mental health disorder or psychosis any differently than inmates who were not incompetent or suffering from a mental health disorder.

11

12

13

14

15

16

142.    Defendant HART , as a result of the Defendants' historical failure to properly train, supervise and discipline their employees, based on issues that HART was made personally aware of by the Grand Jury and should have been made aware through the ICDR process that are the same or similar to TAMARIO's, Defendant HART was deliberately indifferent to TAMARIO'S serious medical needs.

17

18

19

20

21

22

23

24

25

143.    Defendant HART failed to properly supervise his subordinate employees with regard to the need to communicate critical medical and mental health information and the need to provide adequate care.   Defendant HART personally failed to monitor and assess the provision of medical services at the County Jail or designate someone to do it as requested by the Santa Cruz County Grand Jury during their investigation of the provision of medical services at the jail.  As a result, no one supervised or monitored medical services provided to the inmates at the county jail.  TAMARIO died from a direct failure of supervision and monitoring.  Consequently, Defendant HART was deliberately indifferent to the serious medical needs of TAMARIO.

26

27

144.    Defendant HART personally failed to promulgate and enforce adequate policies and procedures related to misconduct and the violation of citizen's civil rights by deputies and medical staff.

Smith, et al v. County, et al.                                                    Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

51

145.   Defendant HART maintained an unofficial policy of acquiescence in the wrongful conduct.  Defendant HART failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations as the official policy maker.

146.   Defendant HART condoned and acquiesced in the abusive behavior of his subordinates by refusing to retrain them, discipline them, or correct their abusive behavior.

147.   Defendant HART was, or should have been, aware that the policy regarding investigation, supervision, and discipline of staff violated the civil rights of inmates or citizens and was so inadequate that it was obvious that a failure to correct it would result in further incidents of dangerous and lawless conduct perpetrated by his subordinates.  (See Exhibit B-C.)

148.   As a result of the Defendant HART's repeated as an individual failure to properly investigate, supervise and discipline deputies, disregarded known and obvious consequences and was deliberately indifferent to the needs of Plaintiffs.  The failure to investigate, supervise and discipline was the moving force behind the violations of the law that occurred to TAMARIO, and the resulting pain and suffering of death.

149.   In addition to the foregoing failures to train, supervise and discipline, Defendant HART's personal and individual failure to conduct or require any inward facing investigation of deaths or of policies implicated in jail deaths as part of the ICDR process directly caused and was a substantial factor in all of his failure to require training on deficiencies that would have been revealed if a non-sham ICDR process was conducted.

150.   Defendant HART set in motion a series of acts by subordinates that the supervisor knew or should reasonably have learned would cause the subordinates to deprive PLAINTIFFS of constitutional rights.

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

52

151.    Defendant HART thus, individually, engaged in conduct in the ICDR meetings, in the preparation for them and in their aftermath that showed a reckless or callous indifference to the deprevation, by the subordinate of the right of TAMARIO and others.

152.    As a direct consequence of the failures of HART to properly train officers and medical staff, TAMARIO suffered unconstitutional treatment and inhumane conditions during his detention all resulting in TAMARIO's suffering, injuries and death, as set forth above in ¶¶ 100-101.

153.    In committing the acts alleged above, Defendant HART acted maliciously, oppressively, and/or with reckless disregard for the rights, safety, medical needs and well-being of Plaintiffs and Decedent, and by reasons thereof, Plaintiffs are entitled to punitive damages and penalties allowable under 42 U.S.C. §1983, California Code of Civil Procedure §§377.20 et seq., and other state and federal law against these individual Defendants; no punitive damages are sought directly against the municipal Defendants.

154.    Plaintiffs are also entitled to reasonable costs and attorney's fees under 42 U.S.C. §1988 and other applicable California codes and laws.

## FOURTH CAUSE OF ACTION
### (42 U.S.C. §1983-MONELL)
### ALL PLAINTIFFS AGAINST COUNTY OF SANTA CRUZ AND WELLPATH LLC/CFMG

155.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in this complaint, as though fully set forth here.

156.    Defendants as COUNTY and its contractor, WELLPATH, LLC./CFMG, and all of their employees acted at all times under color of state law.  In addition, Defendant COUNTY at all times was responsible for any deficient actions of its contractor, WELLPATH, LLC/CFMG as Defendant COUNTY owes a nondelegable duty to provide constitutionally adequate health care to its inmates as the COUNTY has admitted.

157.    Defendants County of SANTA CRUZ and WELLPATH, LLC/CFMG violated TAMARIO's constitutional rights pursuant to the Fourteenth Amendment and the Substantive Due Process Clause in the following categories as set forth below, all of which will be addressed in detail thereafter:

Smith, et al v. County, et al.                                          Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

53

a.     By maintaining unconstitutional policies, long standing practices and customs towards the medical, mental health and custodial care at the Santa Cruz County Jail towards inmates such as TAMARIO;

b.     By engaging in collective inaction towards TAMARIO'S mental health, medical health and custodial care needs;

c.     By failing to prevent violations of law from their subordinates by failing to investigate, train, supervise and discipline their staff;

d.     By violating the right of association between TAMARIO and his parents, Plaintiffs Felicia Smith and Michael Warren Smith; and

e.     By ratifying unconstitutional behavior by employees of Defendants.

158.   There were longstanding and systemic pattern and practices of constitutionally significant deficiencies in the Santa Cruz County jails' treatment of inmates that were a driving force in TAMARIO's death.  Deficiencies included long standing patterns of improper cell checks, improper recording of safety checks, lack of functioning emergency intercom buttons in the jail's cells, inadequate medical and corrections staffing, improper housing classifications, lack of required training and screening, insufficient diagnosis and treatment of medical and psychiatric conditions, lack of communication of necessary and critical medical information among staff, inaccurate recordkeeping, and non-compliant medical policies and procedures.  The totality of all these well-established patterns of constitutional deficiencies collectively caused TAMARIO's death.

159.   These Defendants ignored, delayed, or denied TAMARIO's urgently needed medical and psychiatric care and treatment.  As a result of these Defendants' deliberate indifference and/or callous disregard for Plaintiff's need for medical care and treatment, and their disregard and indifference to this need, TAMARIO suffered damages, pain and suffering, emotional distress, anxiety, depression, confusion, disorientation, loss of relationships, loss of life, and deprivation of constitutional rights, and other damages as alleged herein.

Smith, et al v. County, et al.                                      Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

54

**UNCONSTITUTIONAL CUSTOMS AND PRACTICES RELATED TO MEDICAL, MENTAL HEALTH, AND CUSTODIAL CARE:**

160.    Defendants maintained the permanent, widespread, well-settled practice or custom by denying constitutionally adequate treatment to inmates in serious medical and psychiatric distress and to place inmates in administrative segregation or general population instead of the medical ward when inmates were in need of elevated medical care.  Defendants' unconstitutional patterns, practices and policies denying TAMARIO constitutionally required medical and mental health care include, but are not limited to, the following:

a.    Defendants maintained a custom and practice of not sufficiently monitoring the welfare of inmates, even those inmates known to have serious physical or psychiatric medical needs.

b.    Defendants maintained a custom and practice of failing to conduct proper cell checks as required by the County's own written policies, particularly for segregated inmates with known mental health disorders.

c.    Defendants maintained a custom and practice of not accurately recording safety checks.

d.    Defendants maintained a custom and practice of knowingly understaffing the jail with corrections officers.

e.    Defendants maintained a custom and practice of using segregated housing as a routine housing classification to address the jail's long term understaffing issue as repeatedly noted by the Grand Jury.

f.    Defendants maintained a custom and practice of routinely misclassifying inmates, generally, where the jail was aware that their automated classification system provided incorrect results and yet they knowingly continued to use it for years in violation of County policy 506.4.

Smith, et al v. County, et al.                                                          Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

55

g.   Defendants maintained a custom and practice of not placing mental health inmates -including those found incompetent to stand trial- in mental health units in violation of County policy 506.4.

h.   Defendants maintained a custom and practice of housing minimum security inmates with maximum security inmates in violation of County policy 506.4.

i.   Defendants maintained a custom and practice by failing to properly document classification/housing movements to include consultation with medical and mental health providers in violation of County policies.

j.   Defendants maintained a custom and practice of not placing severely mentally ill inmates in the chronic care program pursuant to contractual obligations and WELLPATH LLC/CFMG policies between the COUNTY and WELLPATH LLC/CFMG.

k.   Defendants maintained a custom and practice of failing to document segregation rounds by medical, corrections and mental health staff in violation of each providers' policies and in violation of state regulations.

l.   Defendants maintained a custom and practice of the jail staff not following its own policies related to locking up cleaning equipment, including corrosive cleaning detergents, and only permitting inmate use with staff monitoring in violation of County Defendants' policy 205, 1100.7 and Title §15 section 1029(a)(6).

m.   Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-A-01 Access to Care by allowing unreasonable delays, having a poorly organized system; delays by providers in prescribing medications to inmates and account for inmates' inability to recognize own needs.

n.   Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-A-02 Responsible Mental Health Authority, where defendants failed to establish appropriate communication links between healthcare and mental health providers.  Defendants established a "bi-furcated"

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

56

system and siloed healthcare where providers were unable to review each other's respective records and care due to the different systems that each Defendant used.

o.      Defendants maintained a custom and practice of failing to have adequate mental health staff meetings that should have included formal minutes, attendance, outline of topics discussed, statistical reports and policy to ensure appropriate care and treatment of inmates with mental health and/or medical issues.

p.      Defendants maintained a custom and practice of failing to have an adequate "Continuous Quality Improvement Program" in accordance with NCCHC policy MH-A-06. County mental health did not have its own quality improvement committee, any measurable way to demonstrate corrective actions taken, studies made or minutes of any such meetings.

q.      Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-A-08, "Communications of Patient's Mental Health Needs."  Defendants failed to have documented communication of inmate's classification needs, appropriate housing for inmates with mental illness and a consistent and reliable method of communication.

r.      Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-A-10, "Procedure in Event of Inmate Death".  Defendants failed to conduct mental health clinical mortality reviews/psychological autopsies to determine the appropriateness of care, effectiveness of policies, whether mental health services could be improved, whether an earlier intervention of was possible and ways to improve patient care.

s.      Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-D-07 regarding Mental Health Staffing.  Defendants failed to conduct all necessary duties to include cell checks on segregated housing, individual and group therapy, mental health screening and participate in the CQI.

Smith, et al v. County, et al.                                              Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

57

t.      Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-D-02, Medication Services.  Defendants failed to provide timely prescription of medications, preventing lapses in medication and continuity of medications.

u.      Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-D-04, Diagnostic Services.  Defendants failed to access blood, urine and oral fluid testing in order to monitor inmate medication levels or to have any policy to address this issue.

v.      Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-D-05, Inpatient Psychiatric Care.  Defendants failed to provide to inpatient psychiatric care to inmates in need. Defendants failed to have the appropriate certifications and documentations to provide W&I 5150 services on site.

w.      Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-E-02, Receiving Screening.  Defendants failed to provide mental health receiving screening by or reviewed by mental health staff.  The jail never used mental health staff to conduct screenings.  Defendants failed to provide documented mental health clearances or signed Request of Information ("ROI") from inmates.  Defendants failed to conduct mental health assessment before receiving screenings preventing Defendants from receiving adequate and appropriate information.

x.      Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-E-04, Mental Health Assessment and Evaluation.   Defendants failed to provide a mental health assessment conducted by a **qualified professional** to inmates within 14 days of their admission to the jail. Defendants failed to treat psychotic inmates as emergencies and place them in immediate treatment.  Defendants failed to communicate findings to corrections staff that effect inmate safety, treatment, housing and programming needs.

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

58

y.      Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-E-07, Segregated Inmates.  Defendants failed to meet with mental health inmates either 3 times or 1 time per week as required.  Defendants failed to document their encounters with inmates.  Defendants' mental health staff failed to provide custody staff with clear guidelines for behavior that requires referrals.  Defendants failed to require mental health staff receive regular feedback regarding inmate behavior during routine segregation checks.

z.      Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-E-09, Continuity of Care.  Defendants failed to provide medication(s) for previous mental health patients. Defendants' medical and mental providers failed to share information about the care and treatment of patients.

aa.      Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-F-01, Education and Self-Care.  Defendants failed to provide basic instructions to mental health inmates to help them become aware of and manage their mental health issues.

bb.      Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-G-02, Programs and Residential Units.  Defendants failed to provide mental health inmates with mental health residential units.

cc.      Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-G-03, Mental Health Treatment Plans.  Defendants failed to provide written statements specifying an inmates' particular course of treatment and mental health professionals' role in the treatment.

dd.      Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-H-01.  Defendants

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

59

failed to provide a process to ensure the sharing of inmate medical and mental health records and the necessary contents of that information.

ee. Defendants maintained a custom and practice of failing to follow standards for Mental Health Services in Correctional Facilities ("NCCHC") policy MH-A-02, A-08, H-01, Inmate Health Information and Communication. Defendants failed to provide an adequate system for communication and information sharing between mental health and health care providers.

ff. Defendants maintained a custom and practice of having medical and mental health intake assessments auto-populate inaccurate answers on forms where inmates were too ill to provide a response. Defendant did not follow policy to reattempt to get answers where inmates could not or would not answer questions on intake and health assessment forms.

gg. Defendants maintained a custom and practice of not sufficiently staffing the jail's Crisis Intervention Team ("CIT") to determine an inmate's needs for immediate mental health medication and monitoring during intake at the main jail.

hh. Defendants maintained a custom and practice of the jail's mental health staff, CIT, having inadequate documenting procedures and lax medical record keeping for the mental health care of inmates at the main jail.

ii. Defendants maintained custom and practice of all staff not following county mental health policies by escalating inmates to LEVEL I priority when inmates were unable or unwilling to respond to critical intake questions pursuant to County Mental Health policies.

jj. Defendants maintained a custom and practice of placing mentally ill inmates in administrative segregation without due process or any reasonable penological basis in violation of County policies and the United States Constitution.

kk. Defendants maintained a custom and practice of not conducting adequately frequent cell inspections and not consistently enforcing rules governing items permitted in cells by jail staff.

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

60

ll.      Defendants maintained a custom and practice of failing to consider inmates as "Special Management" inmates where they did not have behavioral issues but nonetheless, qualified for special management treatment and where they were held in segregation.

mm.      Defendants maintained custom and practice of violating WELLPATH LLC/CFMG policy D-02, by permitting providers to renew medication only after a clinical evaluation of the patient.

nn.      Defendants maintained a custom and practice to not provide any documented consultation related to disciplinary measures, housing assignments, and program assignments in violation of the individual policies of each type of provider and corresponding state regulations.

oo.      Defendants maintained a custom and practice of repeatedly violating the Corrections Special Management Inmates Policy by failing to apply any of the policies to any inmates in protective custody segregation as set forth in the policies and by failing to apply the daily observation log provision and consultation with mental health where appropriate for any inmates.

pp.      Defendants maintained a custom and practice that violated their Corrections Classification policy by failing to train staff on the use of multiple alert codes that expressly relate to mental health patients that are incapable of caring for themselves for any inmates.

qq.      Defendants maintained a custom and practice of not having an adequate independent oversight of WELLPATH LLC/CFMG's delivery of medical services to the County jail.   The absence of quality assurance and corrective actions in WELLPATH LLC/CFMG's annual report of medical services compromised the ability of Defendants to oversee the quality of care in the County jail.   WELLPATH LLC/CFMG has a custom and practice of lacking provisions for external review by authorized investigative persons or agencies.   WELLPATH LLC/CFMG has a custom and practice of not acquiring accreditations required by their contract with the COUNTY.   Without accreditation, WELLPATH LLC/CFMG's adherence to standards cannot be verified.

Smith, et al v. County, et al.                                           Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

61

rr.   Defendants maintained a custom and practice of failing to have procedures for monitoring inmates' younger than 65 potential need for a higher level of care or having any chronic care program that applies to any inmates with only chronic and debilitating mental health problems.

ss.   Defendants maintained a custom and practice of not properly screening inmates for medical care and treatment and conduct proper 14 day assessments as required by industry standards and WELLPATH LLC/CFMG policies.

tt.   Defendants maintained a custom and practice of failing to communicate the medical needs of inmates between the various providers and deputies.

uu.   Defendants maintained a custom and practice of allowing inadequately credentialed staff to perform intake medical and mental health assessments without appropriate clinical supervision.

vv.   Defendants maintained a custom and practice to prescribe medication, and failed to determine what other medications or interventions may be appropriate for a patient without the patient ever being seen by a physician or other qualified mental and medical health care provider.

qq.   Defendants maintained a custom and practice to not properly classify, house and/or monitor inmates who were incompetent to stand trial and inmates suffering from mental health disabilities.

rr.   Defendants maintained a custom and practice that encouraged, allowed and required unlicensed, inadequately trained and/or inadequately supervised staff to conduct assessments and suicide holds on jail inmates on suicide precautions;

ss.   Defendants maintained a custom and practice of failing to provide medical and/or mental health-care for incompetent to stand trial inmates with serious medical and mental health needs.

161.   The foregoing are examples of longstanding practices and customs of Defendants' failing to follow policies that were generally applicable to all inmates equally in the Santa Cruz County jail, including TAMARIO.  Defendants COUNTY and WELLPATH, LLC/CFMG also acted in a

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

62

manner of collective inaction such that multiple providers that provided medical, mental health and custodial services to TAMARIO failed to perform their duties in accordance with the standard of care and acted with deliberate indifference to the rights of TAMARIO.  For example, Defendants WELLPATH, LLC./CFMG's Rule 30(b)(6) witness testified that none of the nursing staff who provided services to TAMARIO and learned that his vital signs were outside of acceptable ranges contacted a provider as required by policy.  The same issue happened on four separate occasions, all with different providers.  The COUNTY's Rule 30(b)(6) witness testified that no one knows who placed TAMARIO in protective custody segregation from the classification team. No one knows why TAMARIO was placed in a segregated unit. No one created any required paperwork.  No one discussed TAMARIO's move from a mental health unit to an isolation unit as required by policy.  No one on the team conducted any reviews of that decision, despite multiple reviews being required.  No one kept the daily housing logs on TAMARIO as required by the policy. No one from mental health or medical assessed TAMARIO's health while he was in segregation for over a month despite such assessments being required on a three times per week basis.  In other words, each of these tasks was the responsibility of entire teams of employees over significant periods of time and no one did any of the actions required by their policies, applicable laws and basic human decency.

162.    Many of the policy violations set forth in detail above in this section applied generally to all inmates at the Santa Cruz County jail.  However, even without showing that similar behavior happened to many other inmates, Plaintiffs can show a "collective indifference" towards TAMARIO alone, which in and of itself indicates a well-established pattern and custom of unconstitutional care at the Santa Cruz County jail.

## FAILURE TO PREVENT VIOLATIONS OF THE LAW BY SUBORDINATES

163.    Defendants COUNTY and WELLPATH, LLC./CFMG's customs and practices regarding investigation training, supervision and discipline were not adequate to prevent violations of law by its employees to handle unusual and recurring situations with which they must deal.

164.    Defendants maintained a custom and practice of failing to institute, require and enforce proper and adequate training, supervision, policies and procedures concerning identifying and caring

Smith, et al v. County, et al.                                        Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

63

for severely mentally ill and/or emotionally disturbed inmates, including those inmates who were incompetent to stand trial.

a.      Defendants maintained a custom and practice of failing to properly train, instruct, monitor, supervise, evaluate, investigate, manage and discipline the individual defendants and other COUNTY and WELLPATH LLC/CFMG personnel, with deliberate indifference to Plaintiffs' constitutional rights, which were thereby violated as described above, and allowed their insufficient resources and inadequate training to influence decision making.

165.    Defendants maintained a custom and practice of covering up violations of constitutional rights by any or all of the following:

a.      Defendant County failed to properly investigate and/or evaluate complaints or incidents related to the claimed customs, policies, practices, and procedures described above in CAUSE OF ACTION THREE to include the actions and systems failures of County Behavioral Health and WELLPATH, LLC/CFMG.

b.      Without any critical self-facing investigation of policies and practices in relation to inmate deaths and/or injuries at the Santa Cruz County Jail, there can be no adequate supervision, understanding of necessary training or discipline.  However, it is safe to say with the sheer magnitude of policy violations, collective actions falling below the standard of care and deaths just in relation to TAMARIO alone, it is very clear that Defendants COUNTY failed to adequately train and supervise its employees as these multitudes of violations occurred on a regular basis for months until TAMARIO finally expired.

c.      Defendants WELLPATH, LLC/CFMG could not produce, when asked, any evidence of supervision of employees as required by its own policies regarding their conducting annual reviews, new employee orientations at the Santa Cruz County Jail, peer reviews, basic credentials and licensing, demonstration of any employees ability to use nursing protocols, scope of work agreements for nurse practitioners, any annual reviews of services, or any other document that would demonstrate any supervisorial oversight of any medical

Smith, et al v. County, et al.                                                    Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

64

employees at the Santa Cruz County Jail.  It permitted insufficiently educated medical assistants to conduct health assessments for which the COUNTY contract and its own policies required a nurse or a doctor.

d.      Defendants WELLPATH, LLC/CFMG could not produce, when asked, any evidence of mental health related training for any of its employees. Many WELLPATH, LLC/CFMG employees testified that an inmates' mental health condition, in their opinion, had no relevance to medical issues.  In fact, the health services administrator had never seen the training logs for any of her employees at the Santa Cruz County Jail.  One employee, Sarahy Plaza candidly testified that she was regularly tasked with conducting mental health evaluations as part of intake screenings and health assessments and that she was not sufficiently educated or trained to do so.  Not one of the practitioners who treated TAMARIO was familiar with symptoms of hyponatremia and thus several misdiagnosed his over consumption of water as under consumption of water.

e.      Despite all of the various violations of its own policies and industry standards as set forth above, as based on the witness testimony and documents originating from WELLPATH, LLC/CFMG, not one employee of Defendant WELLPATH, LLC/CFMG was ever disciplined or corrected in any way.  This is so despite the fact that WELLPATH's only Rule 30(b)(6) witness, Sarah Hewitt, testified that TAMARIO should have been referred to a provider at least four different times where he was tachycardic, sometimes with a pulse as high as 138 beats/min and he never was so referred.  Ms. Hewitt also testified that when TAMARIO suffered from neurological failure related to his hyponatremia, he should have been referred to a doctor.  This was a finding of the morbidity report and no one ever even told the nurse practitioner who failed to make the referral that she should do so in the future.  The nurse who treated TAMARIO's headache by telling him to drink AT LEAST five cups of water without limit did so outside of the nursing protocol she was obligated to follow.  Not one person was disciplined for any of these catastrophic failures leading to TAMARIO's death.

Smith, et al v. County, et al.                                                          Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

65

f.      Defendants WELLPATH, LLC/CFMG did not conduct any investigation of the multitude of policy, practice and systems failures detailed in the complaint other than to criticize the single failure to refer TAMARIO to the doctor days before he died when he suffered neurological failure.  Much like Defendant COUNTY, without any investigation, there can be no supervision or accountability.

g.      Defendants COUNTY failed to train, supervise or discipline its mental health staff.  For years the Grand Jury reported lax record keeping by the CIT/JBH team, which lead to low quality care and deaths.  CIT/JBH did not keep notes of its meetings with staff and did not have access to corrections notes.  CIT/JBH did not keep notes of mental health assessments for inmates in segregation.  JBH did not train Defendant LAZAR, who had no experience or knowledge of being a psychiatrist in a correctional setting.  LAZAR was not told that JBH policies even applied to him and he did not know any of them.  LAZAR practiced medicine and medicated inmates without their informed written consent.  The Rule 30(b)(6) witness for JBH said that the policies were only guidelines and did not have to be adhered to closely.  She, as the director of JBH, was completely unfamiliar with the standards that govern mental health care in correctional settings.  A JBH employee Malka Friedman learned that days before TAMARIO's death he said he needed help because his medications were not working.  She cleared the referral without having anyone see TAMARIO and scheduled an appointment so far out that he was dead by the time it was to occur -more than a week later.  JBH conducted no investigation at all related to the death of TAMARIO.  Not one employee was disciplined despite the numerous violations.  No one supervised Defendant LAZAR at all.

166.    Throughout all of the aforementioned failures to prevent violations of the law through county employees and contractors, Defendants COUNTY and WELLPATH, LLC./CFMG essentially ratified the unconstitutional behavior and actions of its employees and contractors.

167.    The failure of Defendants COUNTY and WELLPATH, LLC/CFMG to prevent violations of the law by  its employees by failing to conduct critical self-facing investigations, provide

Smith, et al v. County, et al.                                          Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

66

adequate training, supervision and discipline caused a deprivation of the plaintiffs rights in that it played a substantial part and was the moving force in the death of TAMARIO.

168.     The aforementioned customs, polices, practices and procedures, the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline, as well as the unconstitutional orders, approvals, ratifications and toleration of wrongful conduct by Defendants COUNTY and WELLPATH LLC/CFMG and certain Does were a moving force and/or proximate cause of the deprivations of Plaintiff's constitutional rights in violation of 42 U.S.C. §1983, as set forth herein.

**DENIAL OF RIGHT OF ASSOCIATION-MONELL**

169.     Plaintiffs Felicia Smith and Michael Warren Smith, allege that through all of the various violations of 28 U.S.C § 1983 as set forth above in this section, Defendants COUNTY and WELLPATH, LLC/CFMG violated their right to association with their son, TAMARIO, pursuant to the Substantive Due Process Clause of the United States Constitution, by causing his death.

170.     Plaintiffs reassert here all facts and allegations as set forth in their SECOND CAUSE OF ACTION above as a violation of Monell.

171.     As a direct and proximate result of the foregoing unconstitutional actions, omissions, customs, policies, practices, and/or procedures of Defendant COUNTY OF SANTA CRUZ AND WELLPATH LLC/CFMG, or the lack of adequacy thereof, Plaintiffs sustained serious and permanent injuries, including death, and damages as set forth above in ¶¶ 100-101 and are entitled to damages, penalties, costs, and attorney's fees, as set forth above .

**FIFTH CAUSE OF ACTION**
**(Wrongful Death- CCP §377.60, *et seq.*)**
**ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

172.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

173.     Defendants owed a duty of care to TAMARIO, they breached their duty of care by committing wrongful acts alleged above, including but not limited to, failure to supervise TAMARIO,

failure to provide adequate and necessary medical care, and failure to provide working emergency buttons in cells so that TAMARIO could summon help, which proximately caused the death of TAMARIO.  Specifically, Defendants deprived TAMARIO of his rights under the United States Constitution to due process of law.

174.    Defendants denied TAMARIO access to necessary medical attention; failed to communicate critical medical information; failed to transport him to the hospital; failed to monitor and/or limit his water and coffee intake as well as allowed him unfettered access to toxic cleaning solutions; and left him in his own vomit and urine in his cell.

175.    Defendant COUNTY of SANTA CRUZ, HART, WELLPATH LLC/CFMG, Dr. GERALD LAZAR, and Does 31-40 failed to acknowledge and treat TAMARIO's serious medical conditions of rhabdomyolysis and schizophrenia and encouraged TAMARIO to drink more water, despite the obvious and grave risks of serious medical complications and death to TAMARIO. Defendants WELLPATH LLC/CFMG, and 31-50 had access to TAMARIO's medical records, knew or should have known that he suffered from hyponatremia, rhabdomyolysis and schizophrenia.  All Defendants failed to communicate with medical and jail personnel to monitor TAMARIO while he was on medications that can cause hyponatremia and restrict TAMARIO's access to water, coffee and prevent him from accessing toxic cleaning chemicals.  Defendants COUNTY of SANTA CRUZ, HART, WELLPATH LLC/CFMG, LAZAR and Does 31-40's failure to provide medical care consistent with the standard of care were both the legal and proximate cause of TAMARIO's death.

176.    The County of Santa Cruz is responsible for the acts of individual and Doe Defendants 4-31 under the theory of respondeat superior and the County's nondelegable duty to provide health care.  In addition, the COUNTY's jail staff and Dr. GERALD LAZAR's failure to supervise and care for TAMARIO as noted above and their failure to provide psychiatric care consistent with the standard of care were also the legal and proximate cause of TAMARIO's death.

Smith, et al v. County, et al.                                                      Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

68

177. The wrongful acts alleged above has destroyed the relationship between Plaintiffs and TAMARIO and has legally, proximately, foreseeably and actually caused severe emotional damages, including the loss of society, companionship, emotional distress, and further economic and non-economic damages according to proof at the time of trial. (See Exhibit M, Declarations of Felicia Smith and Michael Warren-Smith.)

**SIXTH CAUSE OF ACTION**
**Negligence**
**ALL PLAINTIFFS AGAINST DEFENDANTS WELLPATH LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART**

178. Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

179. Defendants WELLPATH, LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART had a duty to Plaintiff to act with ordinary care and prudence so as not to cause harm or injury to another.

180. In evaluating, assessing and handling TAMARIO's medical and psychiatric conditions, all Defendants failed to comply with professional and legal standards.

181. Defendants WELLPATH, LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART improperly, negligently, wrongfully and recklessly failed to provide necessary medical documentation and information to Santa Cruz County Jail personnel regarding TAMARIO's serious medical need.

182. Defendants WELLPATH, LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART negligently, wrongfully, and recklessly failed to properly document TAMARIO's serious medical and psychiatric condition; failed to communicate to the other jail staff regarding the need to monitor TAMARIO while he was on medication that could cause hyponatremia, TAMARIO's water and coffee consumption, deny him access to harmful and toxic cleaning fluids and failed to provide any medical care for a life-threatening condition.

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

69

183.    Defendants WELLPATH, LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART improperly, negligently, wrongfully and recklessly failed to take any action to monitor TAMARIO despite his obvious symptoms of serious illness.

184.    Defendants WELLPATH, LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART negligently, wrongfully, and recklessly failed to render medical care to TAMARIO who is in physical and medical distress.

185.    Defendants WELLPATH, LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART improperly, negligently, wrongfully and recklessly failed to take any action to summon help or transport TAMARIO to the hospital despite his showing symptoms of suffering from hyponatremia.

186.    Defendants WELLPATH, LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART improperly, negligently, wrongfully and recklessly failed to set forth policies regarding proper screening, evaluation, treatment and transportation of inmates suffering from a serious medical condition.

187.    Defendants WELLPATH, LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART improperly, negligently, wrongfully and recklessly failed to conduct any self-evaluation of procedures and training under the Americans with Disability Act and the Rehabilitation Act for its personnel about how to handle encounters with persons who have mental illness, psychogenic polydipsia, or another disability.

188.    By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care to TAMARIO.

189.    The County of Santa Cruz is responsible for the acts of Defendants WELLPATH, LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART under the theory of respondeat superior and a nondelegable duty to provide medical care.

190.    Plaintiffs are informed and believe that Defendants WELLPATH, LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART maintained policies, practices and procedures that allowed for and encouraged the denial of care which ultimately caused the death of TAMARIO.  These policies, practices and procedures include without limitation Defendants' training procedures and practices with respect to supervision of the officers and policies and procedures with regard to providing necessary medical attention.

191.    By engaging in the acts alleged herein, Defendants WELLPATH, LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

192.    As a direct and proximate result of Defendants WELLPATH, LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART's  negligent conduct as described herein, TAMARIO suffered physically and mentally in the amount to be determined at the time of trial and as set forth above in ¶¶ 100-101.

193.    As a further result of Defendants WELLPATH, LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART's  negligent conduct, TAMARIO died.

194.    As a further proximate result of Defendants WELLPATH, LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART's negligent conduct, Plaintiffs FELICIA SMITH and MICHAEL WARREN-SMITH have lost their son and suffered great emotional and mental harm in the amount to be determined at the time of trial.

195.    The conduct of Defendants WELLPATH, LLC/CFMG, GERALD LAZAR, M.D. and JAMES HART also amounts to oppression, fraud or malice within the meaning of Civil Code of Procedure 3294, *et seq*. and punitive damages should be assessed against each Defendant for the purpose of punishment for the sake of example.

**SEVENTH CAUSE OF ACTION**
**(Violation of the Americans with Disability Act of 1990**
**42 U.S.C. §12101, *et seq.*  Titles II and III)**
**ALL PLAINTIFFS AGAINST DEFENDANTS COUNTY OF SANTA CRUZ**
**AND WELLPATH, LLC/CFMG**

196.    Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

197.    Congress enacted the Americans with Disabilities Act ("ADA") upon a finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem."  42. U.S.C. §12101(a)(2).

198.    Pursuant to 42 U.S.C. §12132, "Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

199.    Plaintiff, TAMARIO, was a "qualified individual" with a mental illness, disability and medical impairments that limited and/or substantially limited his ability to care for himself and control his mental or physical health condition as defined under the ADA, 42 U.S.C. §12131(2).

200.    Under Title II and III of the Americans with Disability Act, public entities are required to make reasonable modifications to avoid discrimination on the basis of disability.  The ADA sets an affirmative requirement to act appropriately with respect to inmates with mental and physical disabilities.

201.    Defendant COUNTY is a public entity under Title II of the ADA.  42 U.S.C. §12131(1)(A).  Title II of the ADA applies generally to hospital and jail "services, programs or activities." 42 U.S.C. § 12132.  Defendant County's jail behavioral health center, jails and mental health services are covered under Title II of the ADA.  Furthermore, respondeat superior liability

applies to Title II claims.  Defendant County is therefore liable under Title II of the ADA for the unlawful acts of its employees as well as its private-entity contractors including GERALD LAZAR, M.D., and WELLPATH LLC/CFMG.  Under the ADA, Defendant COUNTY is mandated to develop an effective, integrated, comprehensive system for the delivery of all services to person with mental disabilities, and to ensure that the personal and civil rights of persons who are receiving services under their aegis are protected.   The COUNTY is also liable for the acts of WELLPATH, LLC/CFMG as it maintains a non-delegable duty to provide a constitutional level of health care to inmates in its custody.

202.    Title III of the ADA, 42 U.S.C. §§12181-89, applies to WELLPATH LLC/CFMG.  As they engaged in interstate commerce and operate for-profit business establishments providing health care, WELLPATH LLC/CFMG therefore operates places of public accommodation and are subject to Title III of the ADA.

203.    Title III of the ADA provides in pertinent part that, "[i]t shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual licensing, or other arrangements, with a good, services, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals."  42 U.S.C. §12182(b)(1)(A)(iii).  Under Title III of the ADA, COUNTY and WELLPATH LLC/CFMG are mandated to not discriminate against any qualified individual, "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation."  42 U.S.C. §12182(a).

204.    The ADA creates and affirmative duty in some circumstances to provide special, preferred treatment, or "reasonable accommodation."

205.    Facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced.

206.    Discrimination includes a defendant's failure to make reasonable accommodations to the needs of a disabled person based on his mental health.  These accommodations include specialized training of jail staff, heightened level of medical care and diligent surveillance.

207.    At all material times and described herein, TAMARIO:

a.    Was an individual with a disability know to DEFENDANTS COUNTY and WELLPATH, LLC/CFMG, which included persistent psychosis, schizophrenia, inability to care for himself or report the need for help all lasting more than six consecutive months;

b.    Was otherwise qualified to participate in or receive the benefit of Defendants' services, programs, or activities, including COUNTY's and WELLPATH LLC/CFMG's jail services, programs, activities;

c.    Was either excluded from participation in or denied the benefits of the COUNTY, WELLPATH LLC/CFMG services, programs or activities or was otherwise discriminated against by COUNTY, WELLPATH LLC/CFMG; and

d.    Such exclusion, denial of benefits or discrimination was by reason of his disability.

208.    As described herein, Defendants COUNTY, WELLPATH LLC/CFMG failed to reasonably accommodate TAMARIO's disability by denying him access to the chronic care program for the sole reason that the nature of his injuries/condition related to mental health rather than physical health.  In fact, every inmate in the Santa Cruz County jail who suffered from a mental health as opposed to a physical or medical health condition was equally denied access to chronic care treatment.

209.    As a result, based solely on the nature of his illness as related to mental health, TAMARIO was denied access to high-risk management plans, long term multidisciplinary treatment plans, various special accommodations, special monitoring of his housing, diet and wellbeing, and regular follow up by staff.

Smith, et al v. County, et al.                                                Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

74

210.    The availability of chronic care for mental health patient inmates based on their chronic mental health disorders is the industry standard based on the National Commission for Correctional Health Care's Standards of Services for Mental Health Services at Correctional Facilities, based on the Defendant COUNTY and WELLPATH LLC/CFMG's "chronic care" program as set forth in their contract and based on WELLPATH, LLC/CFMG site specific policy requirements for mental health related chronic care.

211.    DEFENDANTS COUNTY and WELLPATH LLC/CFMG's Rule 30(b)(6) witnesses both acknowledged that despite the obligations in their mutual contracts and policies, person's including TAMARIO SMITH whose chronic disorder was exclusively related to mental health and not medical/physical health were all summarily excluded from chronic care based on the nature of their disease/disorder.

212.    WELLPATH LLC/CFMG's Rule 30(b)(6) acknowledged that TAMARIO qualified for the chronic care program as written in the COUNTY contract and their site specific policies and only failed to receive access to the chronic care program because WELLPATH LLC/CFMG's and the COUNTY refused to provide any chronic care program for inmates who suffered from chronic mental health, as opposed to physical/medical health, related issues based solely on the nature of the health issue.

213.    PLAINTIFFS allege that this failure to permit TAMARIO access to the chronic care program was a substantial factor in his death because his death was caused expressly by the lack of attention and services, which is the one thing chronic care promises.  TAMARIO, despite his severe and qualifying disability, failed to receive necessary, regular skilled monitoring and follow up, a long-term treatment program, medical supervision of his diet and housing, multidisciplinary care and other accommodations that are defined aspects of the chronic care program.  TAMARIO died due to a direct lack of these services where he was inexplicably held in solitary confinement for a long period of time,

was drinking excessive water (to include dirty chemical laden water), was not monitored or followed up with in any skilled way for extended periods of time, never saw a doctor for health-related reasons, and other direct effects of refusal of access to the existing chronic care program.

214.     Other inmates who suffered from conditions other than mental health issues and who were admitted into the chronic care program did not suffer from the same lack of high-risk management plans, long term multidisciplinary treatment plans, various special accommodations, special monitoring of his housing, diet and wellbeing, and regular follow up by staff.

215.     The refusal of access to the chronic care program was a denial of the services, programs or activity based exclusively on the type of disability from which TAMARIO suffered, to wit, a mental health disability.

216.     The regulations promulgated by the Department of Justice to implement Part A of Title II of the ADA require each government entity to conduct a self-evaluation of its programs and services (or the lack thereof) related to persons with disabilities:

   (a) A public entity shall, within one year of the effective date of this part [that is, by January 26, 1993], evaluate its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part and, to the extent modification of any such services, policies, and practices is required, the public entity shall proceed to make the necessary modifications.

   (b) A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the self-evaluation process by submitting comments.

217.     All Defendants failed to conduct any self-evaluation of procedures and training for its personnel about how to handle encounters with persons who have mental illness or another disability and allow such persons to participate in the chronic care program.

218.     Plaintiffs are entitled to declaratory judgment concerning all Defendants' failure to conduct a self-evaluation plan under the Rehabilitation Act and the Americans with Disabilities Act

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

76

1  and injunctive relief, requiring it to modify its programs and services to accommodate person with

2  disabilities.

3         219.    All Defendants violated TAMARIO's clearly established rights under the ADA with

4  deliberate indifference.

5
       220.    The violation of TAMARIO's rights resulted from a municipal policy or custom
6
   adopted or maintained with deliberate indifference.
7

8         221.    As a direct and proximate result of COUNTY, WELLPATH LLC/CFMG's violations

9  of the ADA, TAMARIO suffered serious and permanent injuries, including his death, as set forth

10 above in ¶¶ 100-101, is entitled to damages, penalties, costs and attorney's fees as set forth herein.

11        222.    Plaintiff is entitled to both damages and injunctive and declarative relief.

12
                          **EIGHTH CAUSE OF ACTION**
13            **(Violation of the Rehabilitation Act 29 U.S.C. §794(a))**
              **ALL PLAINTIFFS AGAINST COUNTY OF SANTA CRUZ**
14

15        223.    Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same

16 herein by this reference.

17        224.    The Rehabilitation Act of 1973 ("Section 504") states in pertinent part, provides that,

18 "No otherwise qualified individual with a disability in the United States shall, solely by reason of her
19
   or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to
20
   discrimination under any program or activity receiving Federal financial assistance…" 29 U.S.C.
21
   §794(a).
22

23        225.    Defendant COUNTY receives federal financial assistance as defined in 29 U.S.C.

24 §794(b).

25
       226.    TAMARIO was a "qualified individual with a disability" under the Rehabilitation Act.
26
       227.    Defendant COUNTY violated the rehabilitation Act by failing to make reasonable
27
   accommodations to the needs of TAMARIO, a disabled person.
28

Smith, et al v. County, et al.                                    Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

77

228.    Defendant COUNTY was deliberately indifferent to TAMARIO's serious medical condition.

229.    Instead of providing TAMARIO with adequate medical services and fair treatment, Defendant COUNTY refused to allow TAMARIO to participate in the chronic care program as his condition deteriorated and TAMARIO was dying of hyponatremia.

230.    Defendant COUNTY had actual knowledge of the substantial risk of harm to TAMARIO's from his serious, diagnosed condition and they responded with deliberate indifference by failing to allow him to participate in the chronic care program based on the classification of his health disorder as a mental health disorder.

231.    Defendant COUNTY violated the Rehabilitation Act by failing to conduct any self-evaluation of procedures and training for its personnel about how to handle communications with jails regarding patients who have mental illness or another disability, including polydipsia.

232.    As a direct and proximate result of all of the Defendant COUNTY's conduct as described herein, TAMARIO suffered in the amount to be determined at the time of trial, as set forth above in ¶¶ 100-101.

233.    Plaintiffs are entitled to damages as well as injunctive and declarative relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief against each and every Defendant herein, jointly and severally.

1.    Declaratory relief, finding that Defendants violated Plaintiffs' and Decedent's rights, to serve the purpose of 42 U.S.C. §1983, 42 U.S.C. §12132, including for vindication of those rights as "Private Attorneys' General," elucidation of those rights for the courts, the public, and government officials, and to deter similar wrongdoing by the Defendants and other officials;

2.    Compensatory damages in an amount according to proof, which is fair, just and reasonable;

Smith, et al v. County, et al.
Case No. 5:21-cv-00421-EJD

Fifth Amended Complaint for Damages

78

3.      Punitive damages under 42 U.S.C §1983, federal law, and California law, in an amount according to proof and which is fair, just, and reasonable against all Defendants except the municipal Defendant;

4.      All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§1983 and 1988; 120225 and Title II and Title II of the ADA, 29 U.S.C. §§794 and 794(a)California Code of Civil Procedure §§377.20 et sq., 377.60 et seq., and 102.5; and as otherwise may be allowed by California and/or federal law;

5.      Reasonable attorney's fees and costs; and

5.      For such other and further relief as the Court deems just and proper.

## JURY DEMAND

PLAINTIFFS hereby demand a jury trial in this action.

Dated: June 18, 2024                           *Elizabeth M. Caballero*
                                               _____
                                               Elizabeth M. Caballero
                                               Jonathan Che Gettleman
                                               Caballero & Gettleman Law Office, Inc.
                                               Attorneys for Plaintiffs,
                                               Felicia Smith, Michael Warren-Smith and Decedent,
                                               Tamario Smith

Smith, et al v. County, et al.                                    Fifth Amended Complaint for Damages
Case No. 5:21-cv-00421-EJD

79