Elizabeth M. Caballero, SBN 240249
Jonathan Che Gettleman, SBN 243560
**CABALLERO & GETTLEMAN LAW OFFICE, INC.**
223 River Street, Suite D
Santa Cruz, California 95060
TELEPHONE: 831-427-2658
FACSIMILE: 831-515-5228
EMAIL: *cglaw2015@gmail.com*

*Attorneys for Plaintiffs, Tamario Smith (deceased), Felicia Smith, Michael Warren-Smith*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

| | |
|---|---|
| TAMARIO SMITH, DECEASED, through his Co-Successors-in-Interest FELICIA SMITH, individually and MICHAEL WARREN-SMITH, individually,<br><br>Plaintiffs,<br>vs.<br><br>CALIFORNIA FORENSIC MEDICAL GROUP, INC.; WELLPATH, INC.; WELLPATH, LLC; WELLPATH MANAGEMENT INC.,<br><br>Defendants. | Case No. 5:21-cv-00421-EJD<br><br>**PLAINTIFFS' MOTION IN LIMINE NO. 1 TO EXCLUDE EVIDENCE AND ARGUMENT THAT DECEDENT'S DEATH WAS CAUSED BY INGESTION OF NEUTRA-TEC 64 OR ANY OTHER CLEANING SOLUTION**<br><br>Final Pretrial Conference: June 25, 2026<br>Time: 10:00 a.m.<br>Courtroom: 4, 5th Floor<br>Judge: Hon. Edward J. Davila<br><br>Trial Date: July 20, 2026 |

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Defendants are expected to argue at trial that decedent, Tamario Smith, died from ingesting Neutra-Tec 64, a pink cleaning solution used at the jail. That theory cannot be reconciled with the autopsy and toxicology of record. The autopsying Coroner's report expressly states that the autopsy revealed "no . . . evidence that he had ingested any cleaning fluids" as a cause of death. (Declaration of Jonathan Gettleman, Esq. in support of Plaintiffs' Motion in Limine No. 1 ("Gettleman Decl"), Exhibit A, Deposition Transcript "Dep" of Dr. Stephany Fiore, MD, 67:5–9, quoting Dr. Fiore's autopsy report.) Her sworn

cause-of-death conclusion is "sudden cardiac arrest due to electrolyte imbalance associated with apparent excessive consumption of water and coffee." (Id, at 19:12–14.)

Plaintiffs do not contend that decedent consumed no cleaning solution at all. After the autopsy, the UCSF Clinical Chemistry laboratory detected an active ingredient of Neutra-Tec 64 (C12-C16 ADBA) in decedent's gastric contents. (Id. at 77:6–10.) The Coroner testified that this finding established only that decedent had "some consumption of the cleaning product." (Id. at 77:20–22.) Critically, the Coroner did not amend her cause-of-death conclusion after the UCSF report. Her diagnosis remained electrolyte imbalance from excessive water and coffee, not cleaning-solution toxicity. The trace ingestion the UCSF report confirms is consistent with the Coroner's observation that decedent was seen filling a bottle from the mop bucket "only once," while he filled a cup from the water fountain four times and drank from his own cup twice more. (Id. at 66:24–67:4.)

What the toxicology does show is a vitreous sodium of 123 mEq/L—"profoundly hyponatremic" in the Coroner's sworn characterization. (Id., at 89:18.) The Coroner agreed under oath that olanzapine, decedent's prescribed antipsychotic, "can induce SIADH," and that SIADH causes hyponatremia (Id. at 93:15–19, 94:5–18), that psychiatric medications generally "impair water excretion" (Id. at 92:17–19), and that, had decedent's sodium been monitored within the last week or month before his death, his death "would have been preventable." (Id. at 100:2–7.)

On this record, defendants may not invite the jury to substitute a cleaning-solution causation theory for the Coroner's diagnosis. The theory is inadmissible: it lacks foundation under Rules 401 and 402, it is substantially more prejudicial than probative under Rule 403, and any expert opinion offered to support it is inadmissible as *ipse dixit*. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Plaintiffs do not seek to exclude evidence of the cleaning solution itself, which remains admissible subject to a limiting instruction for the non-causation purpose of showing Wellpath/CFMG's notice of decedent's psychiatric

decompensation. Plaintiffs seek to exclude only the theory that cleaning-solution ingestion caused or contributed to the death.

## II. RELEVANT BACKGROUND

Decedent, Tamario Smith, was twenty-one years old, severely mentally ill, and had been declared incompetent to stand trial on March 26, 2020. He died on May 10, 2020, in the M-Unit of the Santa Cruz Main Jail, where Wellpath/CFMG was the designated health authority. He was prescribed olanzapine, risperidone, benztropine, and trazodone—medications the Coroner agreed can induce or contribute to hyponatremia. (Id. at 92:17–19, 93:15–19, 94:5–18.)

Coroner Stephany Fiore, M.D., conducted the autopsy and authored a report admissible as a public record. *See* Fed. R. Evid. 803(8). (Gettleman Decl., Ex. B, Autopsy and Toxicology report for Decedent Tamario Smith.) The UCSF Clinical Chemistry laboratory later confirmed that decedent had ingested some Neutra-Tec 64; the Coroner did not amend her cause- of-death conclusion after receiving that report. (Gettleman Decl., Ex. A, Fiore Dep. 77:6–22; Ex. B, Autopsy and Toxicology report.)

## III. ARGUMENT

### A. The Coroner Considered the UCSF Finding and Did Not Amend Her Conclusion: Trace Ingestion Was Not a Cause of Death.

Evidence is relevant only if it has “any tendency to make a fact more or less probable than it would be without the evidence” and the fact is “of consequence in determining the action.” Fed. R. Evid. 401. Irrelevant evidence is inadmissible. Fed. R. Evid. 402. Here, the fact in issue is cause of death—and the autopsying Coroner, whose report is admissible as a public record (Fed. R. Evid. 803(8)), expressly

excluded cleaning-solution ingestion from her cause-of-death determination. Her report states the autopsy revealed "no . . . evidence that he had ingested any cleaning fluids" as a cause of death. (Gettleman Decl., Ex. A, Fiore Dep. 67:5–9.) Her cause-of-death conclusion is electrolyte imbalance from excessive water and coffee. (Id, at 19:12–14.) The UCSF laboratory's subsequent confirmation that an active ingredient of Neutra-Tec 64 was present in decedent's gastric contents (Id. at 77:6–10) does not undo that conclusion. The Coroner testified that the UCSF finding established only "some consumption of the cleaning product." (Id. at 77:20–22.) She did not amend her cause-of-death conclusion after the UCSF report. Trace ingestion was thus part of the record she considered—and it did not change her conclusion regarding Mr. Smith's cause of death.

Rules 401 and 402 distinguish facts that bear on a question from facts that determine it. That decedent ingested some cleaning solution bears on his psychiatric decompensation and is admissible for that purpose. That cleaning-solution ingestion caused his death is a different question—one the Coroner answered in the negative and did not reopen after the UCSF report. A defense theory premised on the rejected answer is inadmissible to prove cause of death.

**B. The Toxicology and Volume Evidence Confirm That Any Cleaning-Solution Ingestion Was Trace and Non-Causal.**

*First*, the toxicology shows what the Coroner found and what she did not find. She found a vitreous sodium of 123 mEq/L—"profoundly hyponatremic." (Id. at 89:18.) She did not find any laboratory marker of cleaning-solution-induced cardiac arrest, any evidence of caustic injury to the gastrointestinal mucosa, or any toxicological finding identifying cleaning solution as a cause of death. She agreed under oath that olanzapine "can induce SIADH," that SIADH causes hyponatremia, and that psychiatric medications

generally "impair water excretion" and "can contribute to hyponatremia." (Id. at 92:17–19, 93:15–19, 94:5–18.) The toxicology points in one direction on causation: medication-induced hyponatremia.

*Second*, the volume evidence is consistent with trace ingestion, not causal ingestion. Decedent Tamario Smith filled a bottle from the mop bucket "only once" early in his time out of his cell; he filled a cup from the water fountain four times and drank from his own cup twice more. (Id. at 66:24–67:4.) The gastric contents at autopsy were brown rather than the pink of Neutra-Tec 64, and the Coroner saw "no visible evidence of any pink solution." (Id. at 67:14–19.) The UCSF detection of the active ingredient (Id. at 77:6–10) is consistent with the Coroner's observation that decedent had taken the equivalent of one swig. (Id. at 78:5–6.) Trace ingestion of that magnitude, against a background of profound medication-induced hyponatremia, was not the cause of cardiac arrest.

**C. Any Marginal Probative Value Is Substantially Outweighed by Unfair Prejudice, Confusion of the Issues, and Misleading the Jury.**

Rule 403 permits exclusion of relevant evidence where its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. The Rule's prejudice inquiry asks whether the evidence has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (quoting Fed. R. Evid. 403 advisory committee's note). Each Rule 403 concern is present here at substantial magnitude.

*Unfair prejudice.* The image of a mentally ill, incompetent young man drinking from a mop bucket invites the jury to decide the case on the "improper basis" of moral judgment of the decedent—to treat him as the agent of his own death rather than the victim of the institutional failures at issue. That is the paradigm of unfair prejudice under *Old Chief*.

*Confusion and misleading the jury.* The cleaning-solution theory shifts the jury's focus from the central question—whether Wellpath/CFMG's policies, practices, and customs were the moving force behind the hyponatremic trajectory the Coroner documented—to a sideshow that the Coroner's own findings exclude. A vitreous sodium of 123 mEq/L is not consistent with acute cleaning-solution toxicity; it is, in the Coroner's own words, "profoundly hyponatremic." Permitting defendants to argue otherwise, against the autopsying physician's sworn conclusions, would mislead the jury about what the medical evidence shows.

**D. Any Expert Opinion That Cleaning-Solution Ingestion Caused Decedent's Death Is Inadmissible as *Ipse Dixit*.**

The foundation requirement for expert opinion applies at trial independently of any pretrial *Daubert* ruling. Rule 702 requires that expert opinion be "based on sufficient facts or data," be "the product of reliable principles and methods," and reflect a "reliable" application of those principles "to the facts of the case." Fed. R. Evid. 702(b)–(d) [verify rule text]. An expert opinion is inadmissible when "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Applied here, the test asks: what record data supports an expert opinion that cleaning-solution ingestion caused decedent's death? The Coroner considered the UCSF finding of ingestion and expressly excluded it as a cause of death (Gettleman Decl., Ex. A, Fiore Dep. 67:5–9, 77:20–22); the toxicology shows profound hyponatremia (Id. at 89:18); and the volume evidence shows water from the fountain dominated decedent's fluid intake (Id. at 66:24–67:4). No record evidence supports cleaning-solution causation. To the extent any contrary expert opinion is offered at trial, the Court should exclude it as *ipse dixit*.

Furthermore, inclusion of any testimony regarding the Nutra-tec 64 causing Mr. Smith's death would deprive Plaintiffs' of the right to cross-examine the legitimacy of this opinion where Defendant CFMG's expert, Dr. Paul Fitzgerald, M.D., will opine that Mr. Smith died from asphyxiation from choking on his own vomitus triggered by drinking "cleaning supplies." Dr. Fitzgerald cannot establish the level of Nutra-tec in Mr. Smith's system or anything related to the testing done on Mr. Smith's gastric contents to verify that Nutra-tec was in fact present in his system. Dr. Fitzgerald cannot establish the authenticity of the report or verify any of the methodology for determining the fluid's presence in Mr. Smith's gastric contents. Therefore, any evidence or argument suggesting that the ingestion of Nutra-tec 64 or "cleaning fluid" caused Mr. Smith's death should be excluded.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion and exclude any testimony, argument, exhibit, or suggestion that decedent's death was caused or contributed to by ingestion of Neutra-Tec 64 or any other cleaning solution. Evidence of cleaning solution in decedent's cell environment and of his ingestion of it remains admissible, subject to a limiting instruction, for the non-causation purpose of demonstrating Wellpath/ CFMG's notice of decedent's psychiatric decompensation.

Dated: June 4, 2026

**CABALLERO & GETTLEMAN LAW OFFICE, INC.**

By: *Jonathan Gettleman*
JONATHAN GETTLEMAN
ELIZABETH CABALLERO
Attorneys for Plaintiffs